INGALLS, Respondent, vs. MORRISSEY, imp., Appellant.
INGALLS, Appellant, vs. MORRISSEY, imp., Respondent.

*October 9—October 28, 1913.*

*Libel: Meaning of words: General charge: Justification: Proof of
specific acts of misconduct: Mitigation of damages: Privilege:
Report of judicial proceedings: Criticism of candidate for of-
fice: Malice: Evidence to disprove.*

1. The meaning which must be ascribed to an alleged libelous ar-
ticle is the meaning attributed to it by those who read or
heard it.
2. A newspaper article published by defendant, charging plaintiff,
who was a candidate for Congress, with being a "buccaneer of
the First district political sea" and a "disgrace to his pro-
fession as a lawyer," characterizing him as "admittedly
smooth, tricky, and dishonest," and then purporting to give,
as "a part of his record," certain specific acts of misconduct
in connection with two certain estates, is *held*, taken as a
whole, to be capable of the meaning ascribed to it by the an-
swer, namely, a general charge that the plaintiff was a dis-
grace to his profession as a lawyer, smooth, tricky, and dis-
honest.
3. The charge in such case being general, defendant had a right
to justify by setting up and proving other specific acts of mis-
conduct tending to establish the truth of the charge.
4. Evidence in such case to prove the specific acts of misconduct
was also competent in mitigation of damages.
5. Where a newspaper article charged the plaintiff, an attorney at
law, with divers acts of dishonesty in connection with the
administration of certain estates and with efforts to "fatten
upon the estates of the dead and rob lawful heirs," further
statements in the same article to the effect that interested
parties wishing to consult the records of the county court
had "found that every scrap of paper, everything in the way
of evidence, had mysteriously disappeared," and that "the
documents have never been found and probably never will,"
were capable of the meaning ascribed in an innuendo, namely,
that the plaintiff had feloniously abstracted and carried away
the records of the court.
6. Statements in a newspaper article relating to a candidate for
office, charging him with efforts to "fatten upon the estates

of the dead and rob lawful heirs," and specifically charging him with deception, falsification of accounts, and other acts of misconduct in connection with two certain estates, are *held*, as a matter of law, not to be privileged under sec. 4256a, Stats., as a true and fair report of a judicial proceeding.

7. The fitness of a candidate for office may be publicly discussed and any fair comment or criticism within the bounds of truth is permissible; but the fact 'that he is a candidate does not make a wanton libel privileged.

8. In an action for libel, where express malice was charged and punitory damages were sought, defendant should have been allowed, under a proper answer, to disprove malice by showing that before publishing the article in question he had received information, which he had reasonable grounds to believe and did believe, to the effect that the charge made by him was true, and that the same charge appeared, to his knowledge, in other papers before he published it.

APPEALS from a judgment and an order of the circuit court for Walworth county: F. C. ESCHWEILER, Judge. *Judgment reversed; order affirmed.*

This is an action for libel originally brought against *Maurice Morrissey* and *Edward Morrissey*. On the trial a nonsuit was granted as to *Edward Morrissey*. The following is the article complained of, the portions in parentheses being omitted from the complaint:

*"The Real Record of the Man who Desires to Represent the Great First District of Wisconsin in Congress.*

"Elkhorn, Wis., Aug. 17.—*Wallace Ingalls*, (buccaneer of the First district political sea,) disgrace to his profession as lawyer, and proved guilty of juggling his accounts as administrator of estates, (elected to the legislature and proving traitor to the faction that elevated him to a post of honor)— *Wallace Ingalls*, admittedly smooth and tricky and dishonest—(would represent this superb district in the halls of Congress and take the seat of the man upon whom there has never rested a stain—Henry Allen Cooper.)

"(That class of men who can be styled high-minded stalwarts, men who retain their prejudice against the progressive movement, but who place the seal of disapproval upon

fraud and trickery and hypocrisy, have concluded to no
longer listen to the siren voice of the man who left Walworth
county under a cloud. They declare they will not vote for
*Mr. Ingalls* in the face of his record. And the astounding
part of it all is that *Ingalls,* ashamed to face the good people
of the county where he was raised and leaving it for another
field of endeavor, should now return and solicit support of
former acquaintances for the most honored position within
their gift.)

### "Record of the Courts.

"A part of *Ingalls's* record—that part dealing with his ef-
forts to fatten upon the estates of the dead and rob lawful
heirs—is a record of the courts of this county—or should be.
About a year ago, (when it was announced that *Ingalls* would
try and wrest the Congressional seat from Mr. Cooper,) in-
terested folk, (amazed at the temerity of the man,) pro-
ceeded to the county court to look over the record and freshen
their memories concerning the fraud practiced by *Ingalls*
upon the estate of Hiram R. Whitely; but they found that
*every scrap of paper—everything in the way of evidence—
had mysteriously disappeared.* And the documents have
never been found—and probably never will. (But the ways
of Providence are inscrutable.) ·Copies of these records—
complete in every particular—the complaint of the outraged
heirs, the schedules turned in by *Ingalls* as administrator,
the items wherein *Ingalls* falsified, the court's decision
whereby the present aspirant for Mr. Cooper's seat was forced
to disgorge the large sums of money he had dishonestly tried
to divert to his own use—(all these had been kept by other
parties who little expected that *Ingalls* a few years later
would come before honest men and ask them to place in his
hands a great trust—the trust of all the ·people, rich and
poor, high and low—a trust deemed more and more sacred
as the conscience and honor of the people are being aroused
by fearless and honest men the country over, men of the type
of Roosevelt and La Follette and Bristow and Beveridge and
Nelson and Cooper.

### "The 'Gumshoe Canvass.'

"*Ingalls* has traveled over the district for more than a
year while Cooper has been representing his district at

Washington.   Making no formal announcement of his candidacy—thus shielding himself from criticism of a record that he dreaded—he has 'gumshoed' diligently.   As far as he dared he was a 'progressive' with progressives and a stand-pat high prince among the stalwarts.   He knew his man before he approached him.   He sought the sore spots, and if anywhere he found a disappointed office-seeker, *Ingalls* aimed to make him his lieutenant.   Thus he has built up an 'organization.'   Where *Ingalls* secured his funds to make his systematic and expensive campaign is a mystery, but the source is guessed at.   Here in Wisconsin the people know what Interests are playing the game and who are willing to supply the wherewithal to defeat La Follette and his friends. *Ingalls* is known to be without means of his own.   It is told by Racine people that since the late senatorial contest—whereby one Mr. Stephenson has been able to decorate the 'American House of Lords'—the *Hon. Mr. Ingalls* has had no case in court, has earned no dollar from his profession. *Mr. Ingalls* voted for Stephenson while he was one of the committee to 'investigate' Mr. Stephenson.   There is no record that *Ingalls* obtained his campaign fund other than in a proper manner, but that fund has been plentiful, and so he has traveled and traveled.

### *"Silent About Cases.*

"But from nowhere in the district comes word that *Mr. Ingalls* has told his admirers the dramatic story of the suit of the *Whitelys v. Ingalls,* nor yet has he plumed himself upon the victory he finally won in the case of *Creamer v. Ingalls.*) The cases bear a close resemblance one to the other, and as *Mr. Ingalls* lost one case and won the other, Justice will not frown if the stories are told as they were told in Walworth county courts when *Ingalls* had equipped himself with the subtleties of the law and aimed to get rich—quick.

"(Hiram R. Whitely, a bachelor of the town of Walworth, died and willed his property to Otis L. and Phœbe Ann Whitely, brother and sister respectively, and to Almira Gerow, a niece.   The estate was worth about $10,000.   In the complaint of the legatees, objecting to the allowance by the court of the final account of Administrator *Ingalls,* they swore to a peculiar fact that will make other lawyers wonder

at their modesty.    They averred that *Ingalls* got the job of administrator because he solicited it, telling Otis and Phœbe Ann that being an attorney himself it wouldn't cost them anything for professional services, that he 'would perform all the necessary services as administrator and as attorney for a sum not exceeding $100.'    And Otis and Phœbe Ann thought quite well of his proposal and forthwith hired him.)

### *"A Shady Accounting.*

"But when the *'Hon. Wallace'*—as he is now referred to—filed his account, the two trusting souls learned to their sorrow that they had fallen into the hands of a Philistine. *Ingalls* had charged a per diem amounting to $250 and attorney fees of $350 upon one page and then turned over the page and charged it again—six for one if he was caught at it and twelve for one if it slipped through.    But that wasn't all.    *Wallace* 'pushed a good thing along.'    It developed that he had forgotten to include $7.67 he had received and should have credited to the heirs; it also transpired that he had sold Chicago real estate belonging to the heirs for $2,000—so he stated in his account,—but on being questioned at the trial he admitted that he had entered into a contract to sell it for $2,600, and thinking he could get more failed to deliver the property and finally had to sell it for $2,000.    The judge didn't think well of that yarn and the present candidate for Congress had to make good the $600. *Ingalls,* in his account, had set down that he had paid $51.25 for taxes on Chicago property, but 'the court decided that he had paid only $22.90.    Even in those days he loved to travel at the expense of others, and in the items he charged against the estate were those for eleven conveyances he had hired. (All in all, the final account was an 'interesting exhibit.' The court—the late Judge J. B. WHEELER—not only cut out the duplication of his per diem and attorney fees, but reduced his bill one half—thus saving Otis and Phœbe Ann and Almira $900 in that one particular.    Altogether the court made him account for $714.89 more than he had shown was due the heirs, and disallowed $1,700.88 he had charged against them.    The heirs thus saved a total of nearly $2,500. Otis lives in Harvard now, and he states his opinion of *Ingalls* with somewhat more emphasis and a little less regard for the niceties of English than is attempted in this recital.)

### "Another Famous One.

"The business of administration of estates appealed to *Ingalls.* Along about this time he took charge of the estate of Mahala Martin, deceased. Mahala lived in Big Foot, also in the town of Walworth. *Ingalls* had filed his account and had it allowed and had secured the heirs' interest in the farm before they brought suit, charging him with fraud. As *Ingalls* fought the case through the county court, the circuit court, the supreme court, and back to the circuit court, wore out the heirs and finally won the case, it is quite proper that this story be also told. It bears the title *Creamer v. Ingalls* and the allegations of fraud may be read in the 89th Wisconsin Reports, beginning with page 112.

"This case is famous at the law school of the University of Wisconsin, where it is cited by the instructors of law as a glaring example of what young attorneys ought not to do when appointed administrator, which involves a trust relation sacred in its character.

### "(Fraud is Alleged.

"When Mahala Martin died she willed her property to five nephews and nieces who lived in the far-away states of Utah, Colorado, Missouri, and New York.) The sworn complaint of these heirs is a remarkable document—intensely interesting—but necessarily long, as court documents are. Stripped of some of its legal phraseology they cited their wrongs in this wise:

"'After *Ingalls* had been appointed administrator he began to negotiate with the heirs in regard to their selling their interest in the estate, and as administrator assumed to advise them as to what would be for their best interests. Early in the process of his administration he began systematically to stir up strife between the heirs and a J. S. Belknap, the husband of Mahala's sister, and *Ingalls* fraudulently represented to the heirs that Belknap was intent upon swindling them out of the estate.'

### "How Game was Worked.

"Then *Ingalls* went to Colorado and met the Creamer boys—Daniel and Charles—and what follows is sworn to in their complaint. *Ingalls* 'fraudulently and with intent to deceive them, represented to them that it was a hard mat-

ter to get anything out of the personal property, as the makers of the notes . . . were hard up and the notes could not be collected. *Ingalls* at the same time falsely and fraudulently represented to them that Belknap had brought suit against the estate, which would probably be in court for a number of years and would cost a large sum of money, and that he, *Ingalls,* did not think the heirs' would ever be able to get much of anything out of the estate, whereas *Ingalls* . . . well knew these representations were false and fraudulent and he well knew that the personal property was worth more than the appraised value and the notes were collectible . . . and that some of the notes he had already collected; that *Ingalls* knew the claim of Belknap could be settled for a small part of what was claimed on its face; that at the same time he fraudulently and with intent to deceive advised them to sell out for whatever they could get, and suggested to them that when he returned to Wisconsin he would endeavor to find them a purchaser, although, as he expressed it, it would be pretty hard to find any one who would be willing to buy a law suit.'

### *"Heirs Get Little.*

"To shorten a long story, the heirs alleged in their complaint that *Ingalls began to negotiate with the heirs for the purchase of the farm himself,* but before doing so settled with Belknap. The heirs assigned their interest to *Ingalls.* The consideration named in the deed was $5,000, but *the heirs received only $1,625—$325 each.* The complainants alleged that *Ingalls* falsely and fraudulently represented the true facts as to the conditions of the estate and of the claim of Belknap, with a result that he profited in the sum of about $3,000.

"Suit was begun against *Ingalls* and he filed a general demurrer, which means that he contended that even if the facts as set forth in the petition were true the heirs had no cause for action. This was overruled in county court, an answer denying fraud was filed, and the case was tried before Judge WHEELER, who decided that *Ingalls* had been guilty of the gross frauds charged and ordered that the judgment assigning the estate to *Ingalls* be set aside. *Ingalls* then appealed both the demurrer and the trial on the answer to the circuit

court. Judge FISH overruled the demurrer. *Ingalls* then appealed to the supreme court, which affirmed Judge FISH's decision. Then the parties proceeded to trial of the facts, and the hearing was had on the record of evidence used in the county court. Judge FISH decided in *Ingalls's* favor, contending that the evidence was insufficient to prove fraud. Funds were lacking and the heirs were scattered and the attorneys for the Creamers did not appeal to the supreme court, as was originally intended.

"(Acquaintances of *Ingalls* here state that he felt it wise to soon move to Racine to escape the odium of his work as administrator of these estates.

### "Racine Record Shady.

"Racine lawyers and public officials could add some dramatic pages to this sketch of the man who transferred his activities to their midst and who is now asking the suffrage of high-minded citizens. It is understood that if need be these men are prepared to furnish facts showing that his character has not undergone any change—for the better—in more recent days, but if anything he has grown more bold in his schemes of slippery existence and that he is totally unfit to be a public servant.

"In the legislature his pretended friendship for the workingmen is said by his associates to have been of the most insincere type; that he offered and framed bills which if passed would have brought down upon him the condemnation of every workingman in the state. Indeed, the union men of Racine passed resolutions of a most uncomplimentary character concerning the man. Members of the committee on industrial insurance have no hesitation in calling him a sham and declare that his trip to Europe, for which he rendered a bill to the state for $500, was not worth a cent to the state or its workingmen in actual results.)"

The defendant answered the complaint, setting forth the entire article, and alleged that the article, taken as a whole and read in its true meaning, charged and intended to charge and was understood by the readers thereof to charge the plaintiff generally, and without limitation to the specific acts of misconduct mentioned therein, with being a disgrace to

his profession as a lawyer and smooth, tricky, and dishonest; that said article detailed but a part, and did not purport to in any way state all the facts showing the plaintiff to be a disgrace to his profession as a lawyer and smooth, tricky, and dishonest.

The defendant further set up in the answer the truth of the charge that the plaintiff was a disgrace to his profession as a lawyer and smooth, tricky, and dishonest, and alleged in justification specific acts of misconduct relied upon in addition to those stated in the article; all of which acts specifically alleged were pleaded in justification of the charge that the plaintiff was a disgrace to his profession, smooth, tricky, and dishonest. The defendant also pleaded the truth of the charge connected with the Whitely estate and justified thereunder in accordance with the verdict of the jury. The specific instances of misconduct were pleaded also in mitigation of damages.

Upon the trial the court below struck out all the specific instances of misconduct pleaded and ruled out all evidence offered in support of such charges. The jury returned the following verdict:

"(1) Do you find for plaintiff or defendant as to the Whitely matter?  A. Defendant.

"(2) If you find for plaintiff as to the Whitely matter, at what sum do you assess his compensatory damages in that matter?  A. ——.

"(3) Do you find for plaintiff or defendant as to the Mahala Martin estate matter, also known as *Creamer v. Ingalls* matter?  A. (by court). For plaintiff.

"(4) At what sum do you assess plaintiff's compensatory damages in the Martin matter?  A. $400.

"(5) Do you find for plaintiff or defendant in the matter of the disappearance of the files of the county court in the Whitely estate?  A. Plaintiff.

"(6) If you find for plaintiff in the matter of the disappearance of the files in the Whitely estate, at what sum do you assess plaintiff's compensatory damages?  A. None.

"(7) At what sum, if any, do you assess punitory damages against the defendant? A. $100."

The court changed the answer to the first question from "defendant" to "plaintiff" and ordered judgment in favor of the plaintiff upon the verdict as so changed for $500 and costs. Judgment was entered accordingly, from which this appeal was taken.

For the plaintiff the cause was submitted on the briefs of *D. B. Barnes* and *Wallace Ingalls.*

For the defendants there were briefs by *Olin, Butler & Curkeet,* attorneys, and *H. H. Thomas,* of counsel, and oral argument by *W. R. Curkeet.*

KERWIN, J. 1. This action was brought against *Maurice Morrissey* and *Edward Morrissey,* and upon the trial the court granted a nonsuit as to *Edward Morrissey.* It is claimed on the part of the plaintiff that the nonsuit was improperly granted because *Edward Morrissey* had an interest in the Delavan Republican business and was therefore chargeable with the article published. After a careful examination of the evidence we are convinced that the nonsuit was properly granted on the ground that there is no sufficient proof connecting *Edward Morrissey* with the publication of the article. Nor does the evidence show that he had any interest in the Delavan Republican business. The order, therefore, granting the nonsuit as to *Edward Morrissey* must be affirmed.

2. As appears from the statement of facts, the defendant set up special matter setting forth charges of misconduct upon the part of the plaintiff in addition to those stated in the publication, and offered evidence thereof as tending to prove the charge set forth in the publication to the effect that the plaintiff was a disgrace to his profession as a lawyer and smooth, tricky, and dishonest. On the trial the defendant was confined to the specific matters of misconduct referred

to in the article, the court holding that there was no general charge that the plaintiff was a disgrace to his profession as a lawyer, smooth, tricky, and dishonest, except in the particulars mentioned in the article. We think this ruling was error which must work a reversal of the judgment below.

The article starts out: *"Wallace Ingalls,* buccaneer of the First district political sea, disgrace to his profession as lawyer, and proved guilty of juggling his accounts as administrator of estates," . . . '*"Wallace Ingalls,* admittedly smooth and tricky and dishonest—would represent this superb district in the halls of Congress and take the seat of the man upon whom there has never rested a stain—Henry Allen Cooper."

Farther on in the article under the head of "Record of the Courts" is this: "A part of *Ingalls's* record—that part dealing with his efforts to fatten upon the estates of the dead and rob lawful heirs—is a record of the courts of this county—or should be." Then follows specific matter reciting alleged misconduct of *Ingalls* in the management of estates and also in reference to his campaign against Mr. Cooper. It is quite clear from a reading of the whole article set out in the statement of facts that a general charge was made and intended to be made and would be so understood by readers of the article, and that the special matters of misconduct were set up as a part of the record of the plaintiff; therefore under the authorities in this state and elsewhere the defendant had a right to justify by setting up and proving other specific acts of misconduct tending to prove the general charge, namely, that the plaintiff was a disgrace to his profession as a lawyer and smooth, tricky, and dishonest.

The defendant set up the whole article in the answer and alleged that the portions omitted from the complaint were necessary to be read in connection with the alleged portions in order to arrive at the true meaning of the matters charged, and that the article charged and intended to charge and was

so understood by readers thereof to charge the plaintiff with being a disgrace to his profession as a lawyer, smooth, tricky, and dishonest, and that the article detailed only a part of the facts showing the plaintiff to be such.

The answer further alleges that the charge that plaintiff was a disgrace to his profession as a lawyer, smooth, tricky, and dishonest was true, and alleged in justification thereof specific acts of misconduct in addition to those set forth in the article, the first being an attempt to suborn perjury at Racine in 1899 in connection with a certain slander action in which the plaintiff was attorney; the second, that in 1898 plaintiff acted as attorney in a divorce action in the circuit court for Cook county, Illinois, in which he unlawfully and corruptly received $250 which belonged to his client and which he was not entitled to, and converted the same.   The third instance of misconduct set forth that the plaintiff, being the attorney of one Scott in a case in the federal court at Milwaukee, obtained from his client by false and fraudulent representations a large sum of money which he was not entitled to and converted it to his own use.   The fourth instance of misconduct alleged concerned plaintiff's connection with a divorce suit in Racine county in 1908 in which plaintiff fraudulently and unlawfully obtained money belonging to his client and converted the same.   All of these alleged acts of misconduct were pleaded in detail in the answer in justification of the charge that the plaintiff was a disgrace to his profession as a lawyer, smooth, tricky, and dishonest.   The defendant also pleaded the truth of the charges connected with the Whitely estate and justified thereunder.   The specific instances of misconduct and other facts were also pleaded in mitigation of damages.   Upon the trial the court below struck out all specific instances of misconduct pleaded and ruled out all evidence offered in support thereof.

It is clear that the article taken as a whole is capable of the meaning ascribed to it by the answer, namely, a general charge

that the plaintiff was a disgrace to his profession as a lawyer, smooth, tricky, and dishonest. *Arnold v. Ingram,* 151 Wis. 438, 138 N. W. 111; *Morehead v. Jones,* 2 B. Mon. 210, 36 Am. Dec. 600; *Adamson v. Raymer,* 94 Wis. 243, 68 N. W. 1000. And the meaning which must be ascribed to an article is the meaning attributed to it by those who read or heard it. *Arnold v. Ingram, supra; Pfister v. Milwaukee Free Press Co.* 139 Wis. 627, 121 N. W. 938; *Scofield v. Milwaukee Free Press Co.* 126 Wis. 81, 105 'N. W. 227.

The charge being general, the instances of specific misconduct were properly pleaded in justification and the evidence should have been admitted thereunder tending to establish the truth of the charge. *Bilgrien v. Ulrich,* 150 Wis. 532, 137 N. W. 759; *Adamson v. Raymer,* 94 Wis. 243, 68 N. W. 1000; *Kimball v. Fernandez,* 41 Wis. 329; *Talmadge v. Baker,* 22 Wis. 625.

In *Kimball v. Fernandez, supra,* there was a charge that the plaintiff, a member of Congress, was "a man who makes appointments a source of personal revenue, and that he received $200 from a person for influence in procuring the former's appointment as postmaster." Other instances of similar misconduct were held improperly stricken from the answer.

In the *Bilgrien Case* plaintiff was charged with being a swindler and a cheat, and defendant set forth certain specific acts of misconduct. The answer pleaded the truth of the acts mentioned and other acts of like corruption, and it was held that the specific acts constituted a proper defense.

Evidence was also competent tending to prove the specific acts of misconduct in mitigation of damages. *Kimball v. Fernandez, supra; Adamson v. Raymer, supra; Kennedy v. Holborn,* 16 Wis. 457; *Eviston v. Cramer,* 54 Wis. 220, 11 N. W. 556.

It is clear from the foregoing cases and many others which might be cited that the court below committed reversible error

in striking out portions of the answer setting up specific acts of misconduct and excluding evidence thereunder.

3. It is assigned as error that the question respecting destruction of records in the Whitely estate should not have been submitted to the jury because not libelous, and that the words were not capable of the meaning ascribed to them by the innuendo. It is claimed that the words merely charged disappearance from the court files of the records in 1909 in a manner unknown to the county judge and that they were returned in 1912, and how, when, or by whom was not known to the court or its employees. It is said that the words standing alone are not actionable *per se*. But as we have seen, these words must be read in the light of the whole article, and when so read we think they are capable of the meaning ascribed to them in the innuendo. *Robertson v. Edelstein,* 104 Wis. 440, 80 N. W. 724; *Adamson v. Raymer,* 94 Wis. 243, 68 N. W. 1000; *Smith v. Utley,* 92 Wis. 133, 65 N. W. 744; *Bradley v. Cramer,* 59 Wis. 309, 18 N. W. 268; *Eviston v. Cramer,* 47 Wis. 659, 3 N. W. 392; *Wilson v. Noonan,* 23 Wis. 105; *Jones, V. & Co. v. Townsend's Adm'x,* 21 Fla. 431.

The article charges that "interested folk proceeded to the county court to look over the record and freshen their memory concerning the fraud practiced by *Ingalls* upon the estate of Hiram R. Whitely," and found that every scrap of paper and everything in the way of evidence had mysteriously disappeared, and that the documents had never been found and probably would never be. This language in connection with the balance of the article, which charges *Ingalls* with divers acts of misconduct and efforts to "fatten upon the estates of the dead and rob lawful heirs" as shown by the record of the courts of the county, or should be, together with other portions of the record charging dishonesty in court matters, we think make the charge capable of the meaning ascribed to it, hence there was no error in submitting this portion of the article to the jury.

4. Error is assigned because the court refused to leave to the jury the questions whether the statements as to the Martin estate and the case of *Creamer v. Ingalls* and plaintiff's connection therewith were privileged. Appellant relies upon sec. 4256*a*, Stats., which provides:

"The proprietor, publisher, editor, writer or reporter upon any newspaper published in this state shall not be liable in any civil action for libel for the publication in such newspaper of a true and fair report of any judicial, legislative or other public official proceeding authorized by law or of any public statement, speech, argument or debate in the course of such proceeding. This section shall not be construed to exempt any such proprietor, publisher, editor, writer or reporter from liability for any libelous matter contained in any headline or headings to any such report, or to libelous remarks or comments added or interpolated in any such report or made and published concerning the same, which remarks or comments were not uttered by the person libeled or spoken concerning him in the course of such proceeding by some other person. . . ."

It is quite obvious that the matter of the Martin estate and the case of *Creamer v. Ingalls* were not privileged, and the court was justified in so holding as matter of law. The report of these matters was not a true and fair report of a judicial proceeding within the meaning of the statute, but contained much matter in connection with the report which if false would be libelous. The part of the article relating to the Martin estate and the case of *Creamer v. Ingalls* is set out in the statement of facts and speaks for itself.

It is a mistake to say that because one is a candidate for office he may be wantonly libeled under the pretense of privilege. Of course his fitness for the office may be publicly discussed, and any fair comment or criticism is permissible within the bounds of truth. *Arnold v. Ingram,* 151 Wis. 438, 138 N. W. 111; *Buckstaff v. Viall,* 84 Wis. 129, 54 N. W. 111; *Bronson v. Bruce,* 59 Mich. 467, 26 N. W. 671. In

the matter of the Martin estate the article is not confined to a true and fair report of judicial proceedings, but contains matter not protected by sec. 4256a, Stats. *Pfister v. Sentinel Co.* 108 Wis. 572, 84 N. W. 887; *Ilsley v. Sentinel Co.* 133 Wis. 20, 113 N. W. 425.

We conclude that the statements in the article published as to the Martin estate and the case of *Creamer v. Ingalls* and the plaintiff's connection therewith were not privileged. *Hart v. Sun P. & P. Asso.* 79 Hun, 358, 29 N. Y. Supp. 434; *Scripps v. Reilly,* 38 Mich. 10; *Belknap v. Ball,* 83 Mich. 583, 47 N. W. 674; *Salisbury v. Union & A. Co.* 45 Hun, 120.

5. Error is assigned upon the exclusion of evidence offered by the defendant upon questions of malice and punitory damages. The defendant sought to prove that the defendant had received information which he believed with reference to the Whitely estate charges before the publication of the article referred to in the complaint. The court held that the defendant could not prove that he had received a report of the facts stated in the article from others or that the facts appeared to his knowledge in other papers before he published them. Express malice was alleged in the complaint and punitory damages were allowed by the jury. The evidence offered tended to disprove malice and that defendant had reasonable grounds to believe and did believe that the charge made by him was true. The evidence was competent and should have been allowed under the allegations of the answer, the facts having been pleaded. *Pfister v. Milwaukee Free Press Co.* 139 Wis. 627, 121 N. W. 938; *Earley v. Winn,* 129 Wis. 291, 109 N. W. 633; *Eviston v. Cramer,* 54 Wis. 220, 11 N. W. 556; *Wilson v. Noonan,* 35 Wis. 321, 346; *Bush v. Prosser,* 11 N. Y. 347; *Hearst v. New Yorker Staats Zeitung,* 71 Misc. 7, 129 N. Y. Supp. 1089; *Hatfield v. Lasher,* 81 N. Y. 246; *Brewer v. Chase,* 121 Mich. 526, 80 N. W. 575; *Hewitt v. Pioneer-Press Co.* 23 Minn. 178.

Other errors are assigned, but since the questions involved therein are not likely to arise upon another trial we shall refrain from discussing them. It follows that the judgment of the court below must be reversed.

*By the Court.*—On the defendant *Maurice Morrissey's* appeal the judgment of the court below is reversed, and the cause remanded for a new trial. Upon the appeal of the plaintiff from the order granting a nonsuit as to *Edward Morrissey* the order appealed from is affirmed.