LEUCH, Appellant, vs. BERGER and others, Respondents.

*October 26—December 7, 1915.*

*Libel: Words actionable* per se: *Newspaper publication: Meaning of language: Pleading: Questions for jury: Charges of graft, etc.: Liability of business manager and editor.*

1. Language which imputes a crime is libelous *per se*, as is also language calculated to subject a person to public hatred, degradation, ridicule, or contempt.
2. The question whether or not an article is capable of a libelous meaning is for the court, and such meaning may be so clear that the court should say as matter of law that it is libelous; but where there is any substantial doubt as to what the meaning is, it is for the jury to say whether or not the meaning attributed to the language is the correct one.

3. Where there is no ambiguity in respect to the actionable quality of the language used nor as to the person whom it concerns, no allegation by way of inducement or colloquium is necessary.

4. The defendant may not attribute some recondite meaning to an alleged libelous article and proceed to justify on that basis, for the words must be construed in the plain and popular sense in which they would naturally be understood, read in the light of the entire article.

5. The freedom of the press does not comprehend the publication of untruthful statements about a private person or public officer, where such statements charge crime or tend to make the individual or officer attacked an object of public hatred, ridicule, or contempt; and the publisher is bound at his peril to know whether statements of that character are true or false before they are given out to the world as true.

6. A newspaper article conspicuously headed "City Clerk's Force Charged with Graft," and stating, among other things, that "graft charges" had been made against the "city clerk, and members of his office force" (when in fact no such charges had been made when the article was published), that "City Clerk Leuch and every member of his department are said to be implicated in a scheme to get part of the money appropriated by the common council for the preparation of the tax levy" (when there was no way in which the city clerk could lawfully get any part of such money), might be understood as charging such city clerk with a criminal act, as well as setting forth untrue matter which was calculated to hold him up to public hatred, contempt, and degradation; hence it could not be said as matter of law that such article was not libelous.

7. In such case, the liability of the newspaper corporation being a jury question, the liability of its business manager was also for the jury, upon proof that one of his duties consisted in attending to the circulation of the paper.

8. It being admitted in the answer that the editor of the newspaper had immediate charge and control of it and of all matters published therein, and had active management and control of all the publications of the paper, the question of his liability was also for the jury, even though he testified he knew nothing about the article until after it was published, that he was serving as a Congressman in Washington, D. C., at the time, and that he had nothing to do with the collection of facts from which it was written.

APPEAL from a judgment of the circuit court for Milwaukee county: GEORGE CLEMENTSON, Judge. *Reversed.*

This is an action for libel, based on the publication of the following article:

## "EXTRA.

### "*City Clerk's Force Charged with Graft.*

"Graft charges against *Peter F. Leuch,* city clerk, and members of his office force, were made to the common council Monday afternoon following a probe conducted by Aldermen Coleman, Aldridge, and Krzycki, Social-Democrats.

"City Clerk *Leuch* and every member of his department are said to be implicated in a scheme to get part of the money appropriated by the common council for the preparation of the tax levy.

"Investigation by the Social-Democrats showed that the employees in the clerk's office were receiving their salaries as department clerks and were also receiving money from the fund set aside for the preparation of the tax levy, which is in direct violation of the city charter, forbidding extra compensation to city employees.

"While the common council was in session Monday afternoon the Social-Democrats obtained access to the tax payroll and got the evidence.

"Charles S. Brand, deputy city clerk, who is receiving $150 a month salary, got $180 last month for 'work on the preparation of the tax levy.'

"Herman C. Schultz, first assistant city clerk, receives $166.66 a month salary, and got $57 last month for 'work on the preparation of the tax levy.' Mr. Schultz was a party to the extra payments under protest, his position, it is understood, hanging in the balance.

"Emil F. Allee, second assistant city clerk, is receiving $83.33 a month salary, and got $91.20 last month for 'work on the preparation of the tax levy.'

"John F. Reiff, committee clerk in the city clerk's office, is receiving $125 a month salary. He got $108 last month for 'work on the preparation of the tax levy.'

"Owen D. Murphy, clerk in the city clerk's office, is receiving $100 a month salary. He got $108 a month for 'work on the preparation of the tax levy.'

" 'Eddie' Hinkel, Rose henchman, got $185 for 'work on the preparation of the tax levy.' He, however, is not a regular city employee.

"Alderman Coleman introduced a resolution in the council requesting City Clerk *Leuch* to report to the aldermen the names of the city employees who were receiving double pay in compiling the tax levy.　There was surprise on the faces of the 'nonpartisan' henchmen, who thought they had been secure in their abstractions from the coffers of the city.

"Meanwhile Alderman Coleman had been gathering his evidence, and when City Clerk *Leuch* read the resolution he was armed with all the facts, and urged the passage of the resolution merely as a formality to have the city clerk inform the aldermen of the peculiar jobholding started by the 'nonpartisans' soon after they got in office.

" 'This is graft pure and simple,' said Alderman Coleman. 'The employees of the city clerk's office had been drawing double pay since the beginning of the preparation of the tax levy.　City Clerk *Leuch* was allowed money to hire additional clerks to prepare the tax levy blanks and lists and he did gather in "Eddie" Hinkel and other henchmen of "Dave" Rose and the corrupt machine which was turned to power on the wave of "nonpartisan" victory.　But they were not satisfied to give these fellows jobs.　They went after some of this easy money and a good piece has been divided up among them.'

"Charles S. Brand, accused by the Social-Democrats with receiving two checks from the city, is an officeholder of the old Rose machine.　When *Peter Leuch* became city clerk Brand came back into a steady job for two years.

"Herman C. Schultz, also charged with receiving double pay, has been in the city clerk's office under several administrations.　Because of his knowledge of the office affairs he was held over during the tenure of the Social-Democrats, and Carl D. Thompson, then city clerk, praised his work highly as that of a valued and trusted employee.

"John F. Reiff was appointed committee clerk about a month ago.　He had been a clerk in *Leuch's* department. He was at one time secretary for 'Dave' Rose.

"Owen D. Murphy is a son of ex-Alderman Murphy.　He was brought to the office when the 'nonpartisans' took hold after two years' absence while Carl D. Thompson was city clerk."

By way of answer the defendants, among other defenses, alleged that the matters and things set forth in the article

were true. At the close of the evidence the defendants moved to direct a verdict, which motion was denied, the court stating that "the article when published without explanation was of a libelous character . . . on its face. . . . There must be a recovery by the plaintiff unless it is justified by allegation and proof. The allegation or justification is made in the answer, and the proof in reference to it we have heard." Continuing, the court said:

"I think the article must be considered as a whole in order to determine the specific charge made. The article, when carefully read, is an article that charges that the city clerk violated the law in giving extra pay to members of his department who were drawing a salary; that is as I construe that article. And unless it can be shown by the defendant that that is true, there must be a recovery."

The court prepared a special verdict containing the following questions:

"(1) Did the plaintiff pay or cause to be paid out of the fund placed in his hands of $6,000, for the employment of special help to prepare for the tax levy of 1912, compensation to members of the regular salaried force in his office for extra work done by them in preparation for the tax levy?"

"(2) Was any one of those who were responsible for the conduct of the Milwaukee Leader actuated by express malice against the plaintiff, that is, by a desire and intention to injure him in the publication of the article in question in this case?"

(3) (Related to assessment of damages.)

There was no dispute or controversy as to how the first question should be answered, and it was properly answered "Yes" by the court. After the jury had deliberated some time and had announced that they were unable to agree on the answer to be returned to the second question in the special verdict, the court directed the jury to answer the question "No," and on the verdict thus directed judgment was entered dismissing the complaint, from which judgment plaintiff appeals.

For the appellant there was a brief by *Marshutz & Hoffman* and *Quarles, Spence & Quarles,* attorneys, and *J. H. Marshutz* and *W. C. Quarles,* of counsel, and oral argument by *W. C. Quarles* and *J. H. Marshutz.*

For the respondents there was a brief by *Cochems & Wolfe, W. C. Zabel,* and *Max Schoetz,* attorneys, and *Horace B. Walmsley,* of counsel, and oral argument by *Mr. H. O. Wolfe* and *Mr. Walmsley.*

BARNES, J. Sec. 3 of ch. 376, Laws 1897, provides:

"The city clerk shall make the tax roll of such city as required by law, but he shall receive no compensation for the same other than that provided in section one of this act, but he is hereby authorized to employ such expert assistants as he may deem necessary, the aggregate amount to be paid for such service to be determined by the common council and appropriated for such service from year to year."

In 1912 the city council made an appropriation for the purpose specified in the statute above quoted, and the city clerk proceeded to employ additional help to make out the tax roll for that year. A number of the persons so engaged were employees in the city clerk's office, who performed the extra service in preparing the tax roll outside of regular office hours and were paid therefor. In *Milwaukee v. Reiff,* 157 Wis. 226, 146 N. W. 1130, the court decided that under the statute, sec. 925—31*c,* there was no legal authority for paying these employees anything additional to their salaries on account of any work outside of office hours which they might do on the tax roll. This plaintiff was the city clerk when the transaction detailed took place.

It was the contention of the plaintiff on the trial that in employing help on the tax roll he pursued a practice which had long been in vogue in Milwaukee; that he did so believing in good faith that he was acting within the law in so doing; that the city got value received for the money paid out; that plaintiff did not profit in any sum or amount on account

of the making of the tax roll; and that he was guilty of no intentional wrong doing, but simply of a technical violation of the law which resulted in no substantial injury to any one.

It is and was the claim of the defendants that the article in question, when read and considered as a whole, did no more than charge the plaintiff with having unlawfully paid to the regular employees of the clerk's office named in the article the sums stated, and that the charge was true and therefore the article was not libelous. The controversy in this court presents but a single question, to wit: Should it be said as a matter of law that the article in question does not contain libelous matter?

The law of libel is pretty well settled in this state, and the difficult thing in most libel cases is to properly apply established legal principles to the facts in the case presented.

Language which charges or imputes a crime is libelous *per se. Fehlhaber v. McFadden,* 156 Wis. 462, 146 N. W. 484; *Culver v. Marx,* 157 Wis. 320, 322, 147 N. W. 358; *Bilgrien v. Ulrich,* 150 Wis. 532, 137 N. W. 759; *Ruhland v. Cole,* 143 Wis. 367, 375, 127 N. W. 959. The rule is so elementary that it is really unnecessary to cite authority in support of it. It has also been held in a long line of cases, beginning with *Bradley v. Cramer,* 59 Wis. 309, 18 N. W. 268, and continuing to *Williams v. Hicks P. Co.* 159 Wis. 90, 150 N. W. 183, that language calculated to subject a person to public hatred, degradation, ridicule, or contempt is libelous *per se.* Whether or not an article is capable of a libelous meaning is a question for the court to pass upon. *Scofield v. Milwaukee Free Press Co.* 126 Wis. 81, 87, 105 N. W. 227; *Robertson v. Edelstein,* 104 Wis. 440, 442, 80 N. W. 724; *Dabold v. Chronicle P. Co.* 107 Wis. 357, 362, 83 N. W. 639; *Bradley v. Cramer,* 59 Wis. 309, 312, 18 N. W. 268. Where there is any substantial doubt as to what the meaning of the alleged libelous publication is, it is for the jury to say whether or not the meaning attributed to the language used is

the correct one. *Bradley v. Cramer, supra,* p. 312; *Dabold v. Chronicle P. Co., supra,* p. 362. The meaning may be so clear that a court should say as a matter of law that the article is libelous, leaving only the question of damages for a jury to pass upon. *Williams v. Hicks P. Co.* 159 Wis. 90, 100, 150 N. W. 183. Where there is no ambiguity in respect to the actionable quality of the language used nor as to the person whom it concerns, no allegation by way of inducement or colloquium is necessary. *Bradley v. Cramer, supra.* The defendant may not attribute some recondite meaning to the published article and proceed to justify on this basis. *Pfister v. Milwaukee Free Press Co.* 139 Wis. 627, 121 N. W. 938. The words used must be construed in the plain and popular sense in which they would naturally be understood. *Bradley v. Cramer, supra.* And the words claimed to be libelous must be read in the light of the entire article. *Ingalls v. Morrissey,* 154 Wis. 632, 645, 143 N. W. 681, and cases cited.

Having in mind these legal principles, the question is: Did the trial court err in holding that the article in question went no farther than to charge that plaintiff unlawfully disbursed funds belonging to the city to persons not entitled to receive them because they could not lawfully collect any money for the extra service which they performed? If this be the correct interpretation of the alleged libelous publication, the legal conclusion reached by the lower court is correct.

It seems pretty plain that this article is susceptible of being understood as meaning a great deal more than that plaintiff employed persons to work on the tax roll whom he had no right to employ. The charge of graft was made against the "city clerk's force" in conspicuous headlines. The opening paragraph stated that "Graft charges against *Peter F. Leuch,* city clerk, and members of his office force, were made to the common council Monday afternoon. . . ." This applies to *Leuch* as well as to his subordinates. As a matter of fact,

no such charges had been made when the article was published. The second paragraph stated that "City Clerk *Leuch* and every member of his department are said to be implicated in a scheme to get part of the money appropriated by the common council for the preparation 'of the tax levy." *Leuch* was a salaried officer, and there was no way in which he could lawfully get any part of the money appropriated for making the tax roll. If the statement was true, it was equivalent to saying that *Leuch* had in fact entered into a scheme to embezzle public funds and that a conspiracy had been entered into between him and his employees to loot the public treasury. Continuing, the article states:

"City Clerk *Leuch* was allowed money to hire additional clerks to prepare the tax levy, blanks, and lists, and he did gather in 'Eddie' Hinkel and other henchmen of 'Dave' Rose and the corrupt machine which was turned to power on the wave of 'nonpartisan' victory. But they were not satisfied to give these fellows jobs. They went after some of this easy money and a good piece has been divided up among them."

These statements are accompanied by a recital giving the names of employees who drew pay for alleged extra work and the amounts paid to them. Had the defendants confined the article to these recitals they would have been within their rights. But they did not do so.

Before this court decided the *Reiff Case* (*Milwaukee v. Reiff,* 157 Wis. 226, 146 N. W. 1130) there was a fairly debatable question as to whether sec. 925—31c applied to the city of Milwaukee. Following the custom of his predecessors, or at least some of them, the plaintiff might have honestly reached a wrong conclusion as to what the law was, without being guilty of any crime or even moral turpitude. It was proper enough for a newspaper to state the facts and to express the opinion that in its judgment the acts done were unlawful, but if the officer acted in good faith and simply made an honest mistake it was not allowable to brand him as

a conspirator and a crook.   This court has no disposition to restrain the legitimate freedom of the press.   That freedom does not comprehend the publication of untruthful statements about a private person or public officer, where such statements charge crime or tend to make the individual or officer attacked an object of public hatred, ridicule, or contempt.   In the hurry with which news is gathered and put into print, it is often difficult to verify its accuracy.   But where it is of the character stated, the publisher is bound at his peril to know whether it is true or false before it is given out to the world as true.

We hold that the article in question might well be understood as charging the plaintiff with a criminal act, as well as setting forth matter not justified by the evidence, which was calculated to hold the plaintiff up to public hatred, contempt, and degradation.   A statement that an officer employed persons to do work whom he had no right to employ carries very little odium, if the action taken was the result of an honest mistake.   It is an entirely different matter to assert that the act was done in pursuance of a scheme to enrich the officer and his friends or henchmen at the public expense and to charge in effect that he and they are grafters.

It is argued that no case was made against the defendants *Bistorius* and *Berger*.   As to *Bistorius* the proof showed that he was business manager of the newspaper and that one of his duties consisted in attending to the circulation of it. Under all the authorities the liability of *Bistorius* was a jury question, inasmuch as we hold that the liability of the newspaper corporation should have been submitted to the jury.

*Mr. Berger* was the editor of the paper and testified that he knew nothing about the article until after it was published. There is some conflict of authority in reference to the responsibility of an editor under these circumstances.   Most text-writers place editors in the same class as proprietors and hold that ignorance is no excuse whatever.   Odgers, Libel & S.

(5th ed.) 170; Merrill, Newspaper Libel, 249; Newell, Slander & L. (3d ed.) p. 461, § 480; *Hunt v. Bennett,* 19 N. Y. 173; *Spooner v. Daniels,* 22 Fed. Cas. No. 13,244*a.*

The court in *Smith v. Utley,* 92 Wis. 133, 65 N. W. 744, stated the law to be as follows:

"It is laid down by all the text-writers that the proprietor, publisher, editor, author, and printer are severally and jointly liable.    13 Am. & Eng. Ency. of Law, 372; Fraser, Libel, 7–9, and notes; Odgers, Libel & S. (Bigelow's ed.) *453; Newell, Defamation, S. & L. 239; Townshend, Slander & L. § 115, note 1.    This liability attaches to the editor upon the theory that the matter is constructively under his supervision, and neither the editor nor proprietor is allowed to plead in defense that he was ignorant of the publication.    Merrill, Newspaper Libel, 53.    While evidence that the defendant did not actively or constructively participate in the publication may be introduced, neither the editor, publisher, nor proprietor can defend on the ground merely that he did not know about the libel until after it was published.    Merrill, Newspaper Libel, 249.    Publisher and managing editor are treated alike by the standard text-writers.    This appears to be so elementary that the question has rarely, in recent years, been presented to the courts for consideration.    In *Watts v. Fraser,* a case decided in 1835 in the court of King's Bench, and reported in 7 Adol. & E. 223, both the editor and printer were held liable, though, as said in Fraser, Libel, 10, they had no knowledge whatever of the publication."

We would not be inclined to extend this rule to a case of mere nominal editorship—one where a person held the title but did not exercise the functions appertaining to the position.

The facts before us bearing on the liability of *Berger* are these: It is alleged in the complaint that *Berger* was the editor and that one Heath was the associate editor, "and that at all of the times hereinafter mentioned said defendants *Victor L. Berger* and Frederic Heath had and have immediate charge and control of said newspaper, and the immediate direction and control of all matters published therein; and had and have active management and control of all the publica-

tions of said newspaper." These facts were admitted by the answer, in which all of the defendants joined; so that on the pleadings it stood as a verity in the case that *Berger* had immediate charge and control of the newspaper and the immediate direction and control of the matters published therein as well as the active control of all publications of the paper. If the case rested wholly upon the pleadings there can be no doubt that *Berger* would be liable if the newspaper was, under the rule of *Smith v. Utley, supra.* But he was called as a witness and testified that he "was one of the defendants in the case and that he was the editor-in-chief of the Milwaukee Leader, and was such on December 9, 1912, and that he determined the policy of the paper and was also the superior of Osmore Smith. That on December 9, 1912, he represented the Fifth district of the state of Wisconsin in the House of Representatives at Washington and had been away from the city of Milwaukee for over a year and a half. That he knew the plaintiff, but had never spoken ten words to him in his life and had never been personally introduced to him. That he received the first intimation that the article was published in the Leader on December 9th, when he saw it in Washington, D. C., and that he had nothing to do with the collection of the facts from which the article was written."

This evidence was received without objection and without any withdrawal of the admission of the answer. If the evidence was offered for the purpose of mitigating damages, it would not necessarily conflict with the admission referred to. If it was offered as tending to prove that there was no liability whatever, it would run counter to the admission. In any event the case as to *Berger* should have gone to the jury. Giving his evidence the most favorable construction which it could possibly bear, the admission might be considered by the jury, and if the jury chose to take it as true it might return a verdict accordingly.

*By the Court.*—Judgment reversed, and a new trial is ordered.