PUTNAM, Appellant, vs. BROWNE and another, Respondents.

*December 8, 1915—March 14, 1916.*

*Libel: Privilege: Criticism of candidate for office: False statements: Insults: Newspaper article: Meaning: When libelous: Justification: Proof of substance of charge: Excessive publication.*

1. A candidate for a public office where integrity, incorruptibility, and judicial ability are absolute essentials places his character in these respects before the people for consideration and discussion, and fair comment or criticism—even though caustic and severe—made in good faith and without malice by a newspaper is privileged; but insult, contemptuous phrase, or false and libelous statements of fact are not privileged.

2. Secs. 94—17 and 94—38, Stats. 1911,—providing a penalty for knowingly publishing any false statement intended or tending to affect a candidate at any primary or election,—do not change the principles of law with respect to privilege in a civil action for libel, but add to the penalties which may follow the publication of false and libelous statements of fact regarding candidates for public office.

3. In judging of the meaning of any given part of an alleged libelous newspaper article the whole article must be considered.

4. If a newspaper article conveys the idea that a candidate for office received and took part in the unlawful distribution of a part of a political corruption fund, or that he sold his political influence and surrendered his honest belief for money, it is libelous unless proven to be true; but if it simply conveys the idea that he received and distributed in lawful ways a part of a large political campaign fund and received money for political labor and influence exerted in lawful ways and not contrary to his honest convictions, it is not libelous.

5. A newspaper editorial which contained a thinly veiled comparison of a candidate for judicial office to Judas Iscariot was libelous as matter of law and not privileged, such comparison being a jibe, a contemptuous insult, and not fair criticism of any type.

6. In order to be a complete defense to an action for libel a justification must be as broad as the libel; but it is sufficient if the substance of the charge be proven.

7. Thus, where the alleged libelous statement was that a certain amount of money was received and disbursed by plaintiff for corrupt and unlawful political purposes, it is a sufficient justification to show that a substantial sum was so received and disbursed, though less than the amount charged.

[8. Whether the fact that a newspaper, though primarily a local county paper, had some incidental circulation outside of the county, would prevent it from successfully interposing the defense of privilege when it had honestly discussed the qualifications of candidates for office in that county, not decided.]

APPEAL from a judgment of the circuit court for Waupaca county: CHESTER A. FOWLER, Judge. *Reversed.*

Action for libel. In the spring of 1913 the plaintiff, a lawyer, was a candidate for county judge of Waupaca county and the defendant printing company published in its weekly newspaper, the Waupaca Republican-Post, an editorial partially written by the defendant *Browne,* as follows:

*"Do Voters Look with Favor on Distributor of 'Slush' Money?*

"The statement of campaign disbursements in the campaign of 1910 by the Connor campaign committee shows that *Giles H. Putnam,* candidate from New London for county judge, received several hundred dollars from the big Connor slush fund.

"In the records of the office of register of deeds of Fond du Lac county are the following items filed by James A. Hogan, treasurer of the Republican state committee, his temporary residence being at Fond du Lac at that time:

"On July 23, 1910, check No. 443 for $31.47 to *G. H. Putnam* for services and expenses; August 1, 1910, check No. 798, $13 for expense, *G. H. Putnam;* August 2, 1910, check No. 829, expenses to date, $16.20, *G. H. Putnam;* August 18, 1910, for organization Waupaca county, $50, to *G. H. Putnam; August 18, 1910, organization Manitowoc county, $200, to G. H. Putnam;* August 31, for organization in Waupaca county, $75, to *G. H. Putnam.*

"The campaign of 1910 was one of the most important in the history of Wisconsin or even the nation. La Follette had been doing things in the United States senate. The Wisconsin idea was fast becoming nationalized. The special interests of the country were alarmed, and after many conferences decided to make a final stand in Wisconsin against the progressive movement and defeat La Follette at all hazards. They marshaled to their sides every possible available resource and

a nation-wide conference took place.  W. D. Connor, the Marshfield lumberman, who had been chairman a few years before of the Republican state central committee, and who, as such chairman, had a list of valuable names in each county in the state, was selected as their chairman and they placed in his hands $100,000 which he expended.  How much more was expended by committee out of the state no one will ever know.   La Follette was unable to go upon the stump and had no money to expend for a campaign.   The citizenship of Wisconsin showed that it was not purchasable and that the birthright of citizenship was worth more than a mess of pottage. Loyal citizens, Democrats and Republicans, said that the battle was the people's battle, and, without hope of reward, threw themselves into the contest and La Follette and progressive principles triumphed.

"Wisconsin gave a majority to La Follette of over 100,000 at the primaries.   Waupaca county did its share and stood as one of the banner counties in the state, notwithstanding the fact that *Mr. Putnam,* the candidate for county judge, received $385.67 to defeat La Follette and the principles he stood for.

"Do you think that selling one's influence for $385.67 is a good qualification for a high position like that of county judge?   In days gone by, the receiving of thirty pieces of silver forever and rightfully condemned a man.   Times have not so changed that receiving $385.67 for the purpose of defeating a man who was championing the people's cause ought to be a virtue or a qualification for office.

"We do not know that these sums amounting to $385.67 were all the amounts that were received by *Mr. Putnam* in the eventful campaign of 1910.   Had all of the men who received parts of the Connor slush fund been proud of the part they took in that campaign, we do not imagine that they would have been so quiet about the filing of their expense account which was dug up by an ever-vigilant newspaper reporter and first published by the Milwaukee Journal December 16, 1910. .

"A county judge should be a man of the highest character and integrity, with a reputation above reproach.   W. M. Emmons is such a man.   He was born and raised on a farm in the town of Dayton, Waupaca county, and has lived in Wau-

paca county all his lifetime with the exception of about four years. We have never heard a single word or whisper against his high character, and we believe the people will find him a faithful public servant if they elect him as their county judge."

The defendants by answer denied all malice and claimed that the article was conditionally privileged. They admitted that there was one error in the article, namely, the statement of $200 paid to G. H. Putnam for the organization of Manitowoc county contained in the account of the treasurer of the Republican state committee filed in the office of the register of deeds of Fond du Lac county; but they alleged that the information as to this item was obtained from the previous publication thereof in other newspapers, that the same was undenied by the plaintiff, and was honestly believed by the defendants to be true. The answer also contained an allegation that the plaintiff received some of the items of money named in the article and distributed some portion thereof, and did not disburse for legitimate campaign expenses all of such sums so received by him. This allegation was treated as a partial but not a complete defense.

The jury returned a verdict for the defendants, and the plaintiff appeals from judgment on the verdict.

For the appellant there was a brief by *Martin, Martin & Martin,* and oral argument by *P. H. Martin.*

For the respondents there was a brief by *Browne, Browne & Smith,* attorneys, and *Kreutzer, Bird, Rosenberry & Okoneski,* of counsel, and oral argument by *C. B. Bird* and *L. D. Smith.*

The following opinion was filed January 14, 1916:

WINSLOW, C. J. A number of errors in the charge of the court are alleged, but it seems to us that we can attain greater clarity by treating the case abstractly and stating the general principles applicable than by taking up the alleged errors in detail.

The occasion was one of conditional privilege. The plaintiff was a candidate for the office of county judge, a position where integrity, incorruptibility, and judicial ability are absolute essentials. By his candidacy he placed his character in these respects before the people for consideration and discussion. One voter might in good faith and without malice place before other voters fair criticism of or comment upon the plaintiff's acts in these respects without liability, but he could not make libelous statements of fact which were false any more than. he could if no such candidacy existed, nor could he indulge in insult or contemptuous phrase. A local newspaper might do the same things and no more. But while the privilege is thus confined to fair comment or criticism upon facts, the comment may doubtless be caustic and severe if the facts warrant it. Such has been the position of this court in the case of criticism of public officers. *Buckstaff v. Viall,* 84 Wis. 129, 54 N. W. 111; *Williams v. Hicks P. Co.* 159 Wis. 90, 150 N. W. 183; *Leuch v. Berger,* 161 Wis. 564, 155 N. W. 148. The same rule has also been applied to publications concerning candidates. *Ingalls v. Morrissey,* 154 Wis. 632, 143 N. W. 681.

It is recognized that there is a disagreement in the authorities on the question whether false statements concerning candidates for office made without malice and in good faith are privileged. In some jurisdictions it is held that all matters, true or false, having a bearing on the fitness of a candidate may be published without liability if it be shown that they were published without malice, in good faith, and in the honest belief that the facts stated were true. *Briggs v. Garrett,* 111 Pa. St. 404, 2 Atl. 513; *Coleman v. MacLennan,* 78 Kan. 711, 98 Pac. 281, 20 L. R. A. N. s. 361. We deem the other view, however, to be supported not only by our own decisions but by the better reason and by the great weight of authority in other courts. Newell, Slander & L. (3d ed.) §§ 633–636; 25 Cyc. 402–405 and notes; *Post P. Co. v. Hallam,* 59 Fed. 530.

We do not overlook secs. 94—17 and 94—38 in ch. 650, Laws 1911 (now secs. 12.17 and 4543v, Stats. 1915), which provide that no person shall knowingly publish any false statement in relation to a candidate intended or tending to affect the voting at any primary or election, and also provide for the punishment of such an act criminally by fine or imprisonment . or both. We do not, however, see in these provisions any purpose to change the established principles of law with respect to privilege in a civil action. One of these principles, as we have seen, is that the conditional privilege as regards a public officer or candidate for public office does not extend to false statements of fact. The statutory provisions cited seem intended to add to rather than to subtract from the penalties which may follow the publication of false and libelous statements of fact regarding candidates for public office.

It is true that in certain classes of cases the law of conditional privilege will protect one who makes an entirely false charge, as, for instance, one who communicates to an officer of the law a charge of crime against another, in good faith, believing it to be true, and acting simply from a sense of public duty. *Joseph v. Baars,* 142 Wis. 390, 125 N. W. 913. The reason for this is very plain, and it is equally apparent that it is not present in such cases as the one before us.

Now in the present case the first question for the jury was what meaning the article carried to the readers of the paper. In view of the political conditions in the state in 1910 and at the time of the publication as shown by the evidence, did this article convey the idea to the readers of the paper (1) that the plaintiff received and took part in the unlawful distribution of a part of a political corruption fund in the primary campaign of 1910, or (2) that he sold his political influence and surrendered his honest belief for money in that campaign? If it carried these ideas or either of them it was libelous unless proven to be true. If, however, it simply conveyed the idea that the plaintiff received and distributed in lawful ways a part of a large political campaign fund and

that he received money for political labor and influence ex-
erted in lawful ways and not contrary to his honest convic-
tions, the article was not libelous in these two respects.    In
judging of the meaning of any given part of the article the
whole article is of course to be considered.

The propositions just referred to are really the only state-
ments of fact in the article, but there is a comment upon
them which stands upon an entirely different basis, and that
is the thinly veiled comparison of the plaintiff to Judas Is-
cariot.    This is not a statement of fact but a comment or
criticism.    It likens the plaintiff, not to an ordinary turn-
coat, but to the man who, in the estimation of the Christian
world, committed the greatest crime in history by selling the
life of his divine Master for money.

It requires no argument to prove that this is a jibe, a con-
temptuous insult, and not fair criticism of any type; hence
it is not privileged.    *Curtis v. Mussey,* 6 Gray, 261.    Being
libelous on its face, the only question to be submitted to the
jury in connection with it is the question of the amount of
damages.    Thus the defense of conditional privilege drops
entirely out of the case.

Returning now to the consideration of the questions aris-
ing with regard to the statements of fact first herein dis-
cussed, if the jury find those statements not to carry a libel-
ous meaning they also drop out of the case, but in case the
jury find that they carry the libelous meaning above referred
to, the question will then arise, Are they, or is either of them,
substantially true?    This question, however, will only arise
in case justification is properly pleaded, which it seems is not
the case at present.

It is doubtless true that in order to be a complete defense a
justification must be as broad as the libel, and that an allega-
tion of the truth of a part of the facts alleged in the libel can
operate only as a partial defense.    In the present case the de-
fendants are compelled to admit that the plaintiff did not in

fact receive $200 for organizing Manitowoc county and hence that he did not receive or disburse $385.67 as charged, but $185.67 at the most. Thus it is evident that they cannot plead that the entire sum named in the article was received and disbursed but only a part thereof. Ordinarily this would only be a plea in mitigation of damages, but in a case like the present it would be a plea of justification. The rule is that the substance of the charge only need be proven true. *Nehrling v. Herold Co.* 112 Wis. 558, 567, 88 N. W. 614; *Conner v. Standard P. Co.* 183 Mass. 474, 67 N. E. 596. The material substance of the statement in question (if it be held by the jury to convey a libelous meaning) is that money was received and disbursed by the plaintiff for corrupt and unlawful political purposes, not that precisely $385.67 was so received and disbursed. The quality of the act does not depend upon the amount so long as the amount is substantial and not trivial. It is really immaterial whether it was $50 or $385.67. So if it be shown by the defendants that a substantial sum was so received and disbursed, though that sum be much less than $385.67, they will have shown a justification as to the supposed libelous statement under consideration. There was testimony in the case tending to support the defendants' contention in this regard, but inasmuch as there must be a new trial of the case we forbear to comment upon it.

While there was no law in 1909 limiting the amount which could be legally spent by candidates for public office (the first law on that subject being ch. 650, Laws 1911: secs. 94—1 to 94—38, Stats. 1913), there were many ways in which money could be corruptly and unlawfully used. While men might doubtless be hired to do lawful political labor it was unlawful to buy votes, either directly or indirectly under pretense of paying for work or by the use of other subterfuges. It was, with certain exceptions, unlawful for any person to pay or agree to pay money to secure the

nomination of a state senator or assemblyman unless the person making the promise or payment was a *bona fide* resident of the district, and it was necessarily unlawful to use such moneys for such purposes if collected.    Sec. 4543*b*, Stats. 1898.    Whether there were other unlawful and corrupt uses to which money could be put in 1909 it is unnecessary now to consider.    Similar considerations apply to the supposed charge that the plaintiff sold his political influence for money. The question of the amount of money is entirely immaterial if the fact itself be shown.

We do not deem it necessary to review the charge of the court at length.    It contained at least two vital errors which render a new trial necessary, viz. (1) it did not inform the jury that the comparison to Judas was libelous as matter of law and not privileged, and (2) it told the jury in substance that if the statements were made in good faith and in honest belief in their truth they were privileged whether true or false.

The question was somewhat debated in the argument of the case whether the fact that the newspaper in question, though primarily a local county paper, had some circulation outside of Waupaca county would prevent the successful interposition of the defense of privilege under the rule as to excessive publication announced in *Buckstaff v. Hicks,* 94 Wis. 34, 68 N. W. 403.

The view taken of the case renders it unnecessary to decide this question, but we deem it not improper to remark that the rule as stated in the *Buckstaff Case* seems unquestionably extreme.    Carried to its logical result it means that a distinctively county newspaper with some incidental outside circulation is protected by no privilege when it honestly discusses the qualifications of candidates for county offices, and this would mean practically that there could be no newspaper discussion of the subject because it is believed that all local papers of any influence have more or less outside circulation. While we do not reach the question in this case, we feel jus-

tified in saying that we do not consider it foreclosed by the Buckstaff Case. See on this subject *Coleman v. MacLennan,* 78 Kan. 711, 98 Pac. 281; 25 Cyc. 387; *Hatch v. Lane,* 105 Mass. 394; *Arnold v. Ingram,* 151 Wis. 438, 138 N. W. 111.

*By the Court.*—Judgment reversed, and action remanded for a new trial.

SIEBECKER, J., took no part.

A motion for a rehearing was denied, with $25 costs, on March 14, 1916.