WILLIAMS, Appellant, vs. HICKS PRINTING COMPANY and another, Respondents.

*November 19—December 8, 1914.*

*Libel: Newspaper article: Malice: Conditional privilege: Instructions to jury: Evidence: Other publications: Opinions: Offer to retract:·Damages: Mitigation.*

1. Whether a particular publication would ordinarily be so understood as to be libelous is generally a question of law, although sometimes the characterizing circumstances are such that it is a question of fact, or of mixed law and fact.

2. If a newspaper article naturally tends to make a person appear ridiculous or contemptible or a subject of hatred, or to disgrace him in society or injure him in his business, the right to recover general damages follows as a matter of course, in the absence of truth as a justification or of circumstances of legal excuse.

3. Mere good·faith, honest belief in the truth of the publication, good motives, accident, or inadvertence is not of itself a defense or sufficient to mitigate the actual damages recoverable.

4. Conditional privilege as regards newspaper publications does not go beyond fair criticism in respect to the relations of persons to the public and report of facts. It does not extend to false statements of fact or unjust inferences, nor taunts, nor contemptuous and insulting phrases.

5. A newspaper article in which a reputable lawyer, long in practice and of high standing, was referred to as "an attorney who seems to be entirely ignorant of the first principles of decent courtesy or fairness," as a "puny little member of the bar," and as a "legal neophyte," was libelous as a matter of law.

6. In an action based on such article, no justification having been shown and there being no evidence to indicate that plaintiff's character was not such as to be affected in the ordinary degree thereby, and affirmative evidence that the injury was possibly above the ordinary, it was error to refuse to instruct the jury that the article was libelous *per se* and that plaintiff was entitled to recover his actual damages regardless of whether the publication was made with bad motives or not; and the jury should further have been made to appreciate that nothing short of substantial damages within the field of general damages would be adequate to the case.

7. It was error in such case to refuse to receive in evidence other articles published in defendants' newspaper leading up to the one

in question, and articles subsequently published up to the time the case went to the jury, all of which had a material bearing upon the questions of malice and punitory damages.

8. For the publication of such articles during the trial, defendants should have been reprimanded and perhaps punished by the trial court.

9. It was error to permit defendants' witnesses to testify to their conclusions, opinions, and impressions in respect to the occurrences before the board of review with reference to which the libelous article was published, and to refuse to permit plaintiff to prove just what was said and done before the board of review.

10. It was error, also, to permit one of the defendants to testify as to what he meant by the use of the particular expressions used in the libelous article and his conception of his duty and his rights as a newspaper publisher, or at least such testimony should have been confined to the question of exemplary damages. What the author intended, in such a case, is immaterial on the question whether the article is libelous or what sum of money will measure the loss caused.

11. An offer by defendants to retract any statement in the libelous article if plaintiff would produce to them satisfactory proof of its incorrectness, and to publish any signed article plaintiff might furnish for that purpose, subject to such comments as defendants might see fit to make, the offer being accompanied by a suggestion of still greater humiliation of plaintiff if he resorted to legal remedies for redress, was not such an offer as should be considered in mitigation of the wrong, and the jury should, on plaintiff's request, have been so instructed.

APPEAL from a judgment of the circuit court for Winnebago county: GEO. W. BURNELL, Circuit Judge. *Reversed.*

Action to recover damages for a libelous publication in a newspaper printed and circulated in the city of Oshkosh, Wisconsin.

Defendant corporation was the owner of the newspaper. Defendant *Hicks* was the principal stockholder and practically controlled the corporation. Both were participants in the alleged wrong. Plaintiff was a lawyer in good standing and it was claimed that the article in question was wilfully and maliciously composed and published with intent to injure him in his good name and fame as a lawyer and to bring

him into public contempt' and ridicule. The complaint contained allegations to the effect stated, also all essential allegations to support a recovery, including a copy of the article, as follows:

### "The Rumpus Over Assessments.

"For the past three weeks, the business men of Oshkosh have been more or less wildly excited over a discussion at the city hall on the subject of valuation of the property on which taxes are to be levied next December.

"The whole thing was precipitated by the action of S. Heymann Co., proprietors of the largest department store in the city. The company felt aggrieved because it believed that its valuation, both real and personal, had been placed too high, and through its attorney, it began an aggressive campaign against fifteen or twenty large business concerns, demanding in no uncertain terms that the assessed valuation of the other concerns should be largely increased.

"The Northwestern has published from day to day an impartial report of the proceedings, as it always does everything that interests the public, but until now it has refrained from any editorial comment for the reason that it had no desire to unduly influence the tax court which was investigating the matter. Now that the public inquest is practically finished it feels at liberty to speak its mind and discuss the subject, especially with reference to the effect of the movement on the prosperity of the city.

"When the department store began their movement to raise the assessed valuation of other taxpayers they were clearly within their rights. The law gives any one the legal right to hale into court a fellow taxpayer and make him admit that his property is worth more than it is assessed at, but among business men who value the good will of their neighbors and are familiar with the amenities of every-day life, such a task is at best an ungracious one, even if it is performed with tact, politeness, suavity and the good-natured courtesy which obtains among the well-bred people in the transaction of public business.

"But when such an inquisition is performed by an attorney who seems to be entirely ignorant of the first principles of decent courtesy or fairness, and respectable business men are

brought into court by a police officer, openly accused of false-hood and the uttering of false documents, treated like con-fessed swindlers, badgered and snubbed until the court had to intervene for the protection of the victim, one can only won-der what the fuss is all about.

"It is only fair to assume that if the aggrieved party had gone with his attorney in a quiet and gentlemanly manner to the tax officials and shown that his property had been assessed too high his statement would have been received with candor and fairness, and undoubtedly he would have obtained at least a measure of relief. That is the method which the or-dinary business man pursues and results usually justify the means.

"But the public will wonder how the interests of the party aggrieved can be advanced when his attorney, strutting for a few brief moments in the public eye, flippantly accuses the president of one of our oldest and most reliable manufactur-ing concerns of falsifying his inventory to escape taxation.

"The vice-president of another manufacturing concern tes-tified on oath that the real and personal property of his com-pany was assessed at $200,000 more than the company would sell for, and yet this puny little member of the bar tried his best to produce the impression that the company had juggled its inventories and made a bitter fight to get the company's valuation increased.

"In the case of another taxpayer, this attorney went so far as to actually make a proposition to buy the property in ques-tion, offering $150,000 'spot cash' for it in his overheated de-sire to prejudice the court. The humor of the situation may be appreciated when it is understood that the man who made the offer is one of those who rarely carried around in his pocket any such sums as $150,000. Possibly in his first es-say as an attorney, with his first case in opera bouffe, he felt that it was necessary to rival the feat of the Indiana farmer who came to Chicago to see the sights and then purchase the eighteen-story building known as the Woman's Exchange for $300 which he carried safely in his inside pocket.

"It is unnecessary to review the case any further. The Northwestern is sorry for those manufacturers and business men who have fallen under the displeasure of this attorney, for it is not a very pleasant thing to be unjustly accused of

fraud or disreputable practices. It is a principle in law that. a man is innocent until he is proven guilty, but in the opinion of this legal neophyte every man he points his finger at in court is guilty of all manner of evil doing and all that remains is for the court to pronounce judgment. To him any one who opposes him is steeped in iniquity and unworthy of belief.

"It is difficult to see how the most disagreeable events of the last three weeks have helped anybody. The few dollars. that may be lost or saved by an increase or decrease of one's. valuation at taxpaying time will hardly be counterbalanced by the moral effects following the investigation. The good will of one's neighbors, the satisfaction of having them right,. the comity of interests that exists between every business man in the community—all these things are worth considering and all of them have been sorely tried.

"We think we have made it quite plain that in the opinion. of this paper, and we believe in the opinion of the public, the whole trouble has been caused by the injudicious actions of the attorney in question. The good name of Oshkosh has. been publicly assailed and consequences are likely to follow that will seriously affect the prosperity of the city for all time.

"But it is possible that the client assumes full responsibility for the work of the lawyer. We shall not believe it, however, until we are compelled to."

Defendants admitted publication and joint participation therein as alleged, pleaded that it was neither false nor defamatory, and took issue on all allegations of the complaint as to their conduct being actionable. By way of excuse, justification, and mitigation of damages, this was, in effect, alleged: For some days prior to the publication, the board of review of the city of Oshkosh was in session in due performance of its duties. Plaintiff, as attorney for S. Heymann Co. and himself and by assumption, of all others similarly interested, appeared before the board and made objections to the assessments. The contest instituted and carried on by him was generally known and was of great public interest. In the proceedings aforesaid plaintiff was uniformly overbearing,.

·opinionated, boastful, ungentlemanly, and unlawyerlike. He persisted in a course of intimidation of witnesses, accusing them of false swearing, of trying to avoid testifying, and of falsifying inventories, thereby creating much prejudice against some of them. His conduct was of the same character towards the board. He openly accused its members of improper conduct. He accused some persons of corrupt practices and dishonest conduct, in failing to appear before the board, and charged members of the board with being in collusion with such persons. His conduct created much excitement in the city of Oshkosh. During practically all the sessions of the board such conduct was unfair and insulting, both to taxpayers and members of the board, going to the extent of disregarding principles of common decency and carrying the idea that taxpayers whom he caused to appear were ·corrupt and dishonest, requiring the board, for its own protection and that of such witnesses, to rebuke him. His unfair conduct caused the board to exclude him from examining witnesses in the first instance. The article had reference to the matter aforesaid. It was printed in good faith and as matter of justice to the board and the persons unfairly dealt with before it by plaintiff. It was conditionally privileged ·on that account, and because it was but a fair statement of the facts and criticism of plaintiff's conduct.

Particularly in mitigation, defendants answered thus: Prior to the year 1913, customarily, property in Oshkosh had been assessed upon a uniform basis less than the true value. This was common in Winnebago county. The tax commission ordered its discontinuance. Thereupon the officials of the city of Oshkosh determined to obey such order and gave directions accordingly. Thereupon the assessor assessed the property in said city for taxes for 1913 at its fair value, resulting in a large increase of valuation in many cases, including property of plaintiff's particular client. That instigated such client to contest the matter as before indicated. Such

contest was carried on in the manner aforesaid and was prepared for by arousing prejudice between classes of taxpayers and between them and the board. In all of this the plaintiff was the master spirit in connection with the principal owner of his client's corporation. Before the time for the hearing, plaintiff caused to be prepared and published and given wide circulation, misleading and prejudicial statements and comparisons respecting assessments. The first publication was headed thus: *"Assessed Valuation of Personal Property of Ten of the Largest Local Firms as Now Made by the City Council."*

Other articles followed with head lines appealing to the people as if they were in imminent danger of being greatly wronged. The suggestions of unfairness contained in such articles were made the subject of investigation by the board. The proceedings in that regard, because of the feeling created by the plaintiff, were of great public interest and discussion among the people. During the hearings before the board, defendants' company, by various publications, kept its readers informed of the occurrences. (In this connection the head lines of the articles were set out.) All such articles, as well as the particular one, were published in good faith without malice, as matter of news, and, in the whole, they contained a fair statement of the happenings to which they related. Before commencement of this action defendant company in good faith offered plaintiff free use of its paper for the purpose of replying to anything in the articles complained of and offered to make correction of anything he would point out which was not justified by the facts.

There was evidence on the part of plaintiff that he had been a practicing lawyer in Fond du Lac and Oshkosh, Wisconsin, for some seventeen years; that he was a man of family consisting of a wife and five children; that the ages of the children were fourteen, eleven, eight, six, and four; that he was a subscriber to the newspaper in question and, at the time

the libelous article was published, the paper was read by members of his family.

To show malice plaintiff offered the several articles printed in defendants' newspaper relating to the subject of the particular article.    In the main, they were published prior to the particular one and were pleaded in the answer for justification and mitigation.    They included a repetition of the objectionable matter published during the trial.    On objection they were excluded.    This was followed by the court's refusal to permit appellant's counsel to comment on the pleaded articles in discussing the case to the jury.

There was testimony, unopposed, by six reputable members of the bar of Winnebago county, including the municipal judge, the county judge, and the district attorney, that plaintiff was a lawyer of high standing in the city of Oshkosh.

On behalf of the defendants, evidence was given to prove the allegations of the answer as to the circumstances leading up to the publication, particularly, the proceedings before the board of review.    Such evidence was by persons who were called before the board at the instance of plaintiff, were adversary, were, with or without adequate cause, irritated to a high degree because of being cited to appear and by the course of the examination, and with whom defendants were in full sympathy by reason of belonging to the class who were bitterly opposed to the investigation being carried on, its property being among that particularly singled out as favored in the assessment.

The evidence of such witnesses was, in the main, general, as to plaintiff's conduct during the proceedings before the board and of the impressions it created upon them, instead of as to what he said and did and they said and did, leaving the question of propriety for the jury.  · Objections to this method of proving allegations of the answer as to reprehensible conduct of plaintiff were overruled.

Defendant *Hicks* testified and acknowledged responsibility

for the publication complained of and the general course of the newspaper in relation to the matter.    He said he had no personal knowledge of the subject dealt with in the article; that he obtained his information respecting it from articles published in his paper and conversations with citizens of Oshkosh whom he casually met.    He was permitted to testify, generally, as to his motives in publishing the article and as to the proper sphere of a newspaper, and his opinion respecting his duty to the public to characterize the proceedings of plaintiff before the board, as he viewed it.    He was also permitted to explain what he meant by the particular expressions used in the article; saying, substantially, that by the term "puny little lawyer" he intended to convey the idea that plaintiff was such as compared with the most eminent members of the Oshkosh bar, past and present; that the term "neophyte" was used to characterize plaintiff's conduct as excessively aggressive and enthusiastic in behalf of his cause; such term being ordinarily used to picture an over-active new religious convert, and that the reference to plaintiff's proposition to buy the newspaper property and pay $150,000 cash down for it and comment thereon, was a mere humorous way of ridiculing the idea of plaintiff being able to carry on such large financial transactions on his own account.    There was further proof that, in articles published during the board proceedings, plaintiff was referred to as a "tax ferret" and his proceedings as "tax ferreting."    Upon rebuttal plaintiff was refused permission to prove what was actually said and done before the board of review, in explanation of what his real conduct was and defense of the charge of discourtesy.

Evidence on rebuttal by several witnesses was given to the effect that plaintiff's conduct before the board of review was merely that of an attorney who was vigorously representing the interests of his client.    That it was lawyerlike.    That in the performance of his duty as he saw it, he irritated opposing witnesses, counsel, and members of the board and they,

in turn, irritated him; that the honors were about equal in that respect; that there was a general atmosphere of hostility toward plaintiff and the cause he represented, for which the mayor of the city, who was presiding, was somewhat responsible; that plaintiff, from first to last, pursued, against such opposition, a purpose of showing what his client and what he believed to be injustice in respect to the assessment, and to secure such changes as would make the valuation equitable.

The cause was submitted to the jury under instructions permitting a finding in defendants' favor,—rejecting a request on the part of appellant that the verdict should be in his favor for, at least, compensatory damages, and that the attempt to prove an offer to retract had failed and that what was done in that line was not to be considered in mitigation, resulting in a verdict of no cause of action. Numerous exceptions were taken to the instructions which, so far as necessary, are stated in detail in the opinion.

A motion for a new trial was made upon several grounds including that, by a series of articles published in defendants' newspaper during the several days the action was on trial, the cause of defendants was advocated, the merits of the case misrepresented, and false statements were made; that such course of conduct continued from the first down to the time the jury retired to deliberate upon their verdict, and was continually in evidence before the jury through the papers coming to their notice and created prejudice against plaintiff. The motion was overruled and judgment was rendered for defendants on the verdict.

For the appellant there was a brief by *Williams & Williams,* attorneys, and *Moses Hooper,* of counsel, and the cause was argued orally by *Mr. Hooper* and *Mr. George E. Williams.*

For the respondents there was a brief by *Bouck & Hilton, E. J. Dempsey,* and *John F. Kluwin,* and oral argument by *Mr. Dempsey* and *Mr. Kluwin.*

MARSHALL, J.   The essentials of a libelous publication are too well established in the law to require discussion or even citation of authority.   There is no difference of opinion, as we understand it, between counsel, or counsel and the court, in respect to the matter.   Differences, commonly, in such field spring, not from what is libelous in the abstract, but whether the particular article would ordinarily be understood so as to have a libelous effect.   That, generally, is a question of law, but sometimes the characterizing circumstances are such that it is a question of fact, or of mixed law and fact.

The law of libel is of much importance.   In the field within which libelous activity may operate, great wrongs may be perpetrated, resulting in loss, sometimes beyond the competency of legal remedies to fully redress, because of there being no accurate standard by which the injuries can be accurately measured.   In theory, that is wrong because, in contemplation of law, the collective judgment of a constitutional jury, guided by a wise judicial administrator, is our highest attainable ideal of justice and, so, must be deemed infallibly right in law, though morally it often is not.   But it answers to the constitutional guaranty of "justice . . . completely and without denial . . . conformably to the laws." [Const. art. I, sec. 9.]

Character is man's choicest treasure.   The wrongdoer who robs one of land or money or anything material, essential to his pursuit of happiness, is reprehensible and unworthy of a place in the social state, but one who intentionally robs another of his good character is a wrongdoer in a higher degree, from a moral standpoint, whether so recognized in the law or not.   Life itself without worth-while character is of little or no value to its possessor or any one else, well said by Iago:

"Good name in man and woman, dear my lord,
    Is the immediate jewel of their souls:
Who steals my purse steals trash; 'tis something, nothing;
'Twas mine, 'tis his, and has been slave to thousands;
But he that filches from me my good name
Robs me of that which not enriches him
And makes me poor indeed."

Thus it is evident that cases of this character are of no trifling nature, especially when the professional life of one is involved and the alleged assassin of it is a newspaper proprietor whose activities reach a wide circle, and who has come to be looked to for guidance of public thought. Such a person occupies a very high place in community life. His legitimate function is to inform, to educate, to entertain, to guide, to dignify the good by legitimate methods, to stand for truth and condemn error and, beyond and environed in these generalities, to satisfy the legitimate desires of the reading public,—never to maliciously accuse falsely, or blacken one's character nor expose him to public hatred, contempt, and ridicule, nor produce injury to him in his business, trade, or profession.

Thus, in general, malice is an essential element of libel, but not, necessarily, malice in the sense of actual ill will and intent to injure, constructive malice, so called,—perpetration of the act without lawful excuse—is sufficient. One need not go further on the subject of malice in proving a charge of libel than to prove the publication, unless the situation is such as to fall within the field of conditional privilege, and then malice in law is circumstantially rebutted and malice in fact, or express malice, as it is otherwise called, is required.

. So it is not to be thought that mere good faith, honest belief in the correctness of the publication, or good motives, or accident or inadvertence, is, of itself, a defense, or even sufficient to mitigate as to actual damages, because such faith, belief, and motive are not inconsistent with malice in law arising, as a legal result, from the perpetration of the act of publishing an article, the natural tendency of which is to make its victim appear ridiculous or contemptible, or a subject of hatred, or to disgrace him in society or injure him in his business.

If a published article naturally tends, as suggested, the right to recover general damages follows as matter of course, in the absence of truth as a justification or circumstances of

legal excuse, this, as indicated, not including mere negligence, accident, good faith, good motives, or sense of duty, except as said, in the field of conditional privilege where something more . than implied malice is required.  General damages, which so follow, may be added to by exemplary damages, upon proof of that actual malice which overcomes the protection of conditional privilege.   Thus one cannot efficiently claim immunity from liability for damages inflicted by publishing with express malice a false and defamatory article, by putting up the shield of conditional privilege.  *Joseph v. Baars,* 142 Wis. 390, 125 N. W. 913; *Arnold v. Ingram,* 151 Wis. 438, 138 N. W. 111.

The law as to what is within the field of conditional privilege and what is not, needs to be little discussed here, if at all.   Such as it is, it applies to newspapers as well as to individuals.   The freedom of the press has never been, and quite likely will not be, extended so as to accord to persons circumstanced as the respondents were special rights to injure or destroy human character by libelous publications.   There is more reason for restricting the privilege respecting such particular class because of the special opportunity to do harm, than for extending it.   Conditional privilege as regards newspaper activity does not go beyond fair criticism in respect to the relations of persons to the public and report of facts.   It does not extend to false statements of fact or unjust inferences, nor taunts, nor contemptuous and insulting phrases. That is sufficient to condemn the article in question.

The foregoing stated principles need no support by citations.   Applied to the facts of this case the article was libelous, as matter of law, and it is so conceded, though the concession is far too restrictive.   It was replete with false statements of fact, contemptuous allusions, and sarcastic phrases, well calculated to humiliate, and it was devoid of all cast of fair comment.   No one could read it and partake of its spirit without regarding its victim as of low degree as a

citizen and lawyer; no one could be the butt of such ridicule without feeling a keen sense of humiliation and loss.

Counsel seek to minimize the wrong by claiming that the only false statement contained in the article is as to appellant being a "puny little lawyer." The article is to be looked at in its entirety, not in mere matters of detail. If it were true that several false detail statements were claimed and truth as to all but one was established, the article, as a whole, still being libelous, plaintiff would be entitled to recover substantial damages. But as we read the record the article, in general scope and details, stands without justification by proof of truth.

The evidence, without dispute, is that appellant was a reputable lawyer,—one of high standing,—who had been long in practice where the paper was published and circulated; that he was not a "puny little lawyer" in any sense of the word. He was not a "neophyte," a novice, a mere beginner. The suggestion, involved in the use of that term, has no basis in truth whatever. Neither was there any proof to show that appellant could not have bought the newspaper plant and made the offer legitimately. He seems to have had at least one wealthy client and may have had many who were quite willing to test the fairness of the assessment of such property by a *bona fide* offer to buy it at the stated price. The article indicated a studied attempt to belittle with insinuations and assertions which were the mere ebullitions of perverted partisan hostility to the efforts of appellant to serve his client's cause. In detail and entirety it is plainly libelous as matter of law.

As no justification was shown and the mitigating circumstances, if there were any, had no bearing on actual damages (*Candrian v. Miller*, 98 Wis. 164, 73 N. W. 1004; *Pellardis v. Journal P. Co.* 99 Wis. 156, 161, 74 N. W. 99), and there was no evidence to indicate appellant's character was not such as would be affected in the ordinary degree by such a wrong, while there was affirmative evidence that the degree of injury

was, quite likely, above the ordinary, it was error for the trial
court to refuse to instruct the jury that he was entitled to re-
cover his actual damages and regardless of the question of
whether the publication was made with bad motives or not.
The jury should have been so instructed and, to guard against
their committing error by finding merely nominal damages,
they should have been made to appreciate that nothing short
of substantial damages within the field of general damages
would be adequate to the case.    The law presumes, in such a
case, that such damages were suffered as naturally and ordi-
narily flow from such a wrong under such circumstances.
The standing of the injured one in the community is to be
taken into consideration, his social station and relations, his
business and its character, and all other circumstances bear-
ing on the question.    These are called general damages.    There
is no standard in law by which the loss in respect to such mat-
ters can be measured but the sound judgment of a constitu-
tional jury under proper judicial guidance.

The trial court instructed the jury: "It is for you to deter-
mine whether the charges have been proven and were pub-
lished from good motives and justifiable ends."    That was
error as has been indicated.    The pleaded justification was
not established in any substantial degree, and the jury should
have been so plainly instructed instead of being left to find
to the contrary and thus prevent appellant from obtaining the
redress he was entitled to.

For the errors indicated the judgment must be reversed.
Other errors were committed which were so involved in the
particular one that, without being specifically referred to,
they will not be likely to occur again.

There were still other errors committed which might or
might not, by themselves be regarded as prejudicial to an
extent requiring reversal.    We will briefly refer to them to
guard against the cause unnecessarily coming to this court
again.

Complaint is made because the court refused to receive in evidence several articles published in respondents' paper leading up to the particular one, and the articles published thereafter up to the time the jury retired to deliberate upon their verdict. That complaint is well taken. The pleaded articles were part of the record in the case. They were really in evidence without any formal offering. The ruling of the court refusing to permit them to be read was wrong. All of the articles had a very material bearing on the motives of respondents and the subject of punitory damages. The publications during the trial were circumstances of aggravation and might well have been considered quite persuasive in appellant's favor on the subject of malicious purpose to injure characterizing the particular publication. The late publications were especially reprehensible. The court should not only have allowed the circumstance to go before the jury as tending to prove express malice, but, promptly, upon the course of the paper being brought to its attention, it should have reprimanded respondents, and, in case of their persistency, administered proper punishment. The practice of newspaper proprietors when on trial for libel being permitted to reach the jury, day by day, during the trial through the columns of the journal is not to be tolerated. If attempted it should be met in such a way as to redress the wrong and prevent its re-occurrence. As well might a party to any trial reach the jurors by written or printed communications, or even by going among them and verbally discussing the case and giving direction to their thoughts.

Further complaint is made because the court permitted respondents' witnesses to testify to their conclusions, opinions, and impressions in respect to the occurrences before the board of review, and refused to permit appellant to meet them by proof of just what was said and done, leaving the question of whether that constituted palliation of the wrong charged. The conduct of the trial in this respect does not meet with

our approval.    The witnesses who were called before the board
seem to have been quite offended, and particularly because of
the course of their examination.    All that might well be ex-
plained by their partisan hostility to proceedings which were
perfectly legitimate.    The material thing was whether there
was just and adequate ground for the state of mind created
by their experiences before the board.    What was said and
done was the test which should have been called for and, in
the end, the jury should have been made to understand that,
at best for defendants, the evidence bore only on the question
of actual damages.

Respondent *Hicks* was allowed to testify, at length, as to
what he meant by the use of the particular terms appearing
in the article, his conception of his duty and his rights as a
newspaper publisher.    That course of the evidence, permitted
under objection, was, in the main, wrong.    How would per-
sons ordinarily understand the article?    That was the ques-
tion and, in the circumstances as to the right to recover, it
was not a jury question; and as to the extent of the jury re-
specting compensatory damages the mere notion or opinion of
respondent *Hicks* was immaterial.    The court should have
rested the meaning of the article upon that which would ordi-
narily be attributed thereto and not permitted the jury to be
confused by the mere opinions of the accused.    It should, at
least, have confined all such evidence to the field of exemplary
damages.    The rule has often been stated.    How would such
an article ordinarily impress readers of it under the circum-
stances of its publication and circulation?    What one or more
would understand, or did understand, or what the author in-
tended is immaterial either on the question of whether the ar-
ticle is libelous or of what sum of money will measure the
loss caused.    *Bradley v. Cramer,* 59 Wis. 309, 18 N. W. 268;
*Pandow v. Eichsted,* 90 Wis. 298, 63 N. W. 284; *Arnold v.
Ingram,* 151 Wis. 438, 456, 138 N. W. 111.

There was proof in support of the plea of an offer to retract, as a mitigating circumstance, that prior to commencement of the action, respondents offered to publish a retraction of any statement contained in the alleged libelous article upon appellant producing to them satisfactory proof of such statement being incorrect; that being accompanied by a suggestion of still greater humiliation of plaintiff in case of his resorting to legal remedies for redress, and also accompanied by an offer to publish any signed article appellant might furnish for that purpose, such publication to be subject to such comments as respondents might see fit to make. Counsel requested the court to instruct the jury that such circumstance should not be considered in mitigation of the wrong done to appellant and it was refused. No reason occurs to us why the jury should not have been so instructed. Proof of such circumstance was made by respondents upon the theory that it, in a measure, so atoned for the wrong done as to remove any ground for punitory damages. The matter seems to have been dealt with to the jury in a way to affect their judgment even in the field of actual damages. The circumstance did not constitute an offer to retract in any sense rendering it worthy of consideration by the jury. The communication reaffirmed what was asserted in the published article and, in effect, challenged appellant to combat it, with a threat that if he should seek a legal forum for vindication instead of the field occupied by the newspaper, he would run serious risk of further humiliation. It was rather a matter in aggravation than mitigation, and the requested instruction should have been given.

It is needless to say that error was committed after verdict, in refusing to set it aside as contrary to the law and the evidence, and we may well add, the question of whether error of prejudicial character was not committed in refusing to relieve from the verdict on account of misconduct of respond-

ents during the trial, challenges serious attention. We may pass it without saying more, since more is not necessary for the case.

In harmony with what was said at the start, no particular effort has been made to reinforce the points made in this opinion by a citation of authorities. The questions are very few and very simple. The significant error is the refusal to charge the jury, plainly and unequivocally, that the article complained of was libelous *per se;* that the pleaded justification was not established and that appellant was entitled to recover substantial damages for the wrong done to him. Quite likely he was prejudiced in respect to a substantial award for exemplary damages by being precluded from proving the circumstances of aggravation involved in the general course of respondents down to the time of the jurors retiring to deliberate upon the case, and the course of the evidence, placing before them the opinions and impressions of witnesses instead of facts and the refusal to instruct, and emphatically, that the so-called offer to retract was not such an offer in fact and was rather proper to be considered on the subject of aggravation than mitigation or justification. With the particular treatment as to the dominating errors and the general treatment as to the others it is thought that none of those complained of need occur upon a second trial.

*By the Court.*—The judgment is reversed, and the cause is remanded for a new trial.