SINGLER, Appellant, vs. JOURNAL COMPANY and another, Respondents.

*April 5—April 30, 1935.*

For the appellant there were briefs by *Rubin & Zabel,* attorneys, and *W. B. Rubin* and *Michael Levin* of counsel, all of Milwaukee, and oral argument by *Mr. Rubin* and *Mr. Levin.*

For the respondents there was a brief by *Miller, Mack & Fairchild* of Milwaukee, attorneys for The Journal Company, the *Attorney General* and *H. H. Thomas* of Madison, special counsel, for the respondent Joe D. Beck, and oral argument by *Mr. Thomas* and *Mr. J. Gilbert Hardgrove* of Milwaukee.

WICKHEM, J.   A voluminous record is presented upon this appeal, and a short statement of the background of this controversy may assist in understanding the legal problems presented.

At the times in question, plaintiff was president of the Wisconsin Co-operative Milk Pool. He was a farmer, thirty-eight years of age, living at Shiocton, Wisconsin. He joined the Wisconsin Co-operative Milk Pool as a member on February 17, 1932, and was elected its president in June of that year. The organization of the milk pool was one of the immediate results of dissatisfaction upon the part of dairy farmers with existing practices connected with the distribu-

tion of milk. It was the position of plaintiff and those associated with him in the Wisconsin Milk Pool that the milk market was under the control of a combination of large dairy companies to whom the farmers must sell their milk, and who engaged in practices which need not here be reviewed, but which resulted in forcing the farmer to sell his milk at less than the cost of production. Upon his election as president of the pool, plaintiff became active in the promotion of his views as to the causes of the farmers' difficulties and the proper remedies therefor. The balance of plaintiff's efforts were expended in increasing the pool's membership. He was in frequent contact with the state department of agriculture and markets, which consists of three commissioners. The defendant Beck was and is one of the commissioners.

During the course of this preliminary work plaintiff came to the conclusion that the department of agriculture and markets, organized under three heads, was inefficient and of little use to the farmers, and that a one-man commission should be substituted. By February, 1933, the membership of the milk pool had grown to eight thousand members, and its officials were of the view that effective relief for dairy farmers could only be obtained by withholding their product from the market until such time as a fair price would be offered for it. In other words, the principle of the strike as theretofore applicable to industrial disputes, was to be applied to the relief of the dairy farmers. In accordance with this view, a strike was authorized by the pool, to take effect December 15, 1932. This was postponed until February, 1933, when it was carried out, the strike ending February 22, 1933. On May 13, 1933, a second strike was called to enforce demands and promises made in the settlement of the February strike and claimed to have been unfulfilled. During the course of the February strike the contract referred to in defendant's radio broadcast was drafted. During the strike the pool had a bargaining committee, which negotiated with several independent milk dealers for the purchase of

milk from pool members at $1.40 per hundred, this being the price claimed by the pool to be fair. It is plaintiff's claim that the contract in question had for its foundation the idea that since all of the pool members could not sell their milk due to the small number of independents who could be contacted, the farmers who could sell milk at $1.40 per hundred should help equalize the loss of the farmer who was keeping or dumping his milk. Plaintiff claims that to carry out this idea the contract in question was conceived and drafted, but never executed. This contract contemplated three parties: First, the milk pool; second, the local milk drivers' union; and, third, whatever milk distributors the contract should ultimately be made with. The distributors agreed to buy milk at the farms of the pool members in good standing, and to pay therefor $1.40 per hundred. Payments were to be made seventy cents to the farmer delivering the milk, and seventy cents "to go to the Milk Pool payable to the Negotiation Committee, A. H. Christman, Chairman, and Oscar Klumb, Treasurer." The contract appears to have been applicable to the period of the holiday or strike.

The defendant Beck, according to plaintiff's claim, was opposed to a one-man department of agriculture; opposed to changing the base and surplus practices, to which the pool objected, and while favorable to the pool's activities during its earlier months, is claimed to have been opposed to them, at least when the strike was ordered. On May 13th, as heretofore stated, the second strike was called.

The radio broadcast here involved was made on May 15th, over The Journal Company's broadcasting station, WTMJ, a station of state-wide sending capacity. The portion of the radio address which is claimed to be defamatory is as follows:

"Talk about 'racketeers.' The Chicago gangsters have nothing on Singler. The Chicago gangsters admit farmers' truckloads of milk, averaging around 4,000 pounds into Chicago for $8.00 a load. The tribute Mr. Singler would levy

on that load would be $28.00. That tribute levied on all the milk going into Milwaukee would amount to $7,000 per day, or over two and a half million dollars per year. But a small sum like that would not satisfy Mr. Singler. He says, according to press reports, that his first step is to get control of all the fluid milk. At 70 cents per 100 pounds, this would increase his income to about $7,000,000 per year. But he isn't even satisfied with that. He now says he is going to include all farm products. If he would be willing to divide them with the farmer on the same 50–50 basis as he proposes to do with milk, his income would be around $100,-000,000 a year, because the gross income of the farmers of Wisconsin last year amounted to about $200,000,000. He may conclude to do that. But why stop with Wisconsin? Why not include the earth, and then, like Alexander of old, sit down and weep because there are not other worlds to conquer?"

Since the jury have found that the statement quoted would not be understood by persons of average intelligence and comprehension to charge plaintiff with the crime of extortion by means of levying tribute upon farmers, the first question to be determined is whether this portion of the address so plainly and unambiguously defames plaintiff in this respect as to constitute libel or slander *per se*. Due to the fact that this was a radio broadcast, it is a serious question whether the case is governed by the law of libel or that of slander. *Sorenson v. Wood,* 123 Neb. 348, 243 N. W. 82; *Miles v. Louis Wasmer, Inc.,* 172 Wash. 466, 20 Pac. (2d) 847; *Coffey v. Midland Broadcasting Co.* (D. C. Mo.) 8 Fed. Supp. 889.

In view of our conclusion that, considered as libel, the most that plaintiff can establish is that there was a jury question as to the defamatory character of the broadcast, we do not find it necessary to determine this question.

So far as its procedural aspects are concerned, the law is not in question. If the meaning of the publication is clear and unambiguous, the issue is for the court. *Williams v.*

*Hicks Printing Co.* 159 Wis. 90, 150 N. W. 183; *York v. Cole,* 190 Wis. 179, 208 N. W. 944; *Arnold v. Ingram,* 151 Wis. 438, 138 N. W. 111; *Leuch v. Berger,* 161 Wis. 564, 155 N. W. 148; *Putnam v. Browne,* 162 Wis. 524, 155 N. W. 910. If it is ambiguous, the issue is for the jury. *Bradley v. Cramer,* 59 Wis. 309, 18 N. W. 268; *Dabold v. Chronicle Publishing Co.* 107 Wis. 357, 83 N. W. 639; *Leuch v. Berger, supra; Grant v. Yates,* 184 Wis. 236, 199 N. W. 53; *Lubcke v. Teckam,* 179 Wis. 543, 191 N. W. 968; *Lisko v. Retzlaff,* 156 Wis. 247, 145 N. W. 648; *Hoff-lund v. Journal Co.* 88 Wis. 369, 60 N. W. 263; *Arnold v. Ingram, supra; Culver v. Marx,* 157 Wis. 320, 147 N. W. 358. In determining the defamatory character of the publication, the entire article should be examined, and isolated portions should not be considered independently unless in fact and in meaning they are plainly isolated from the context of the article. *Putnam v. Browne, supra; Culver v. Marx, supra; Robertson v. Edelstein,* 104 Wis. 440, 80 N. W. 724. With these rules in mind, consideration may be given to the broadcast itself.

The broadcast begins with the statement that about two years ago racketeers seem to have made a concerted onslaught upon agriculture; that they have recognized the desperate circumstances of the farmer and used this to their advantage by selling impractical schemes to the farmer for bettering his condition, and then have come to the department of agriculture and markets for help in their schemes. The address states that the department has refused aid to this class of promoters, has warned the farmers against them, and has stated that it will indorse no untried schemes or no schemes for which sufficient farm leadership has not been developed. The address states that large numbers of farmers made inquiry concerning plaintiff. Then follows a review of plaintiff's activities prior to the time that he became active in the milk pool. In substance, these were characterized as ex-

tremely varied, largely promotional in character, and entirely disconnected with farming. The broadcast then refers to the organization of the pool, plaintiff's influence in it, and the calling of the February strike. The contract, heretofore referred to, is stated to have been initiated by plaintiff and the paragraph concerning the payment of seventy cents to the farmer and seventy cents to the pool is literally quoted, namely, seventy cents "to go to the Milk Pool payable to the Negotiation Committee, A. H. Christman, Chairman, and Oscar Klumb, Treasurer." The speech continues:

"It will be noted from the above contract that the pool was on a strike to secure $1.40 per hundredweight, but half of that was to be paid to A. H. Christman, negotiator for the pool, leaving only seventy cents for the farmers, or thirty-five cents less than they were already getting."

Following this statement comes the alleged libelous material, after a short paragraph in which criticism is directed at Mr. Christman. With this background the alleged libelous matter is introduced by the phrase, "Talk about 'racketeers.' The Chicago gangsters have nothing on Singler." The portions claimed to constitute libel are plainly comments upon the contract previously referred to in the address and part of which had theretofore been quoted. Defendant characterized this contract as being on a par with certain activities of racketeers and Chicago gangsters, detailed in the paragraph. This was followed by some rather extravagant estimates of what the execution of such a contract would mean if carried out with respect to all the farmers of the state, and ends up with the conclusion that if plaintiff proposes to extend his activities to all farm products "his income would be around $100,000,000 a year, because the gross income of the farmers of Wisconsin last year amounted to about $200,000,000. He may conclude to do that. But why stop with Wisconsin?" The speech concludes with the statement that plaintiff has sought by various means to impede efforts of the depart-

ment of agriculture and markets to give real help to the farmers, and that he has repeatedly threatened and attempted to carry out the threat to break up other milk co-operatives in order to compel all dairy farmers to join the pool.

In view of the fact that this case was submitted to a jury, and the jury found the broadcast not to have been defamatory, it will be unnecessary to determine whether the broadcast was capable of a defamatory meaning. If it was capable of being taken in a nondefamatory sense, the jury's verdict must be sustained. In determining this question, it will be necessary to consider the matter with reference to the first and third questions of the special verdict. In the first question the jury was asked in substance whether the broadcast would be understood by a person of average intelligence and comprehension to charge plaintiff with the crime of extortion by means of levying tribute upon farmers delivering milk into the city of Milwaukee and other centers. It is our conclusion that the most that can be claimed by plaintiff is that there was a jury issue with respect to this question. Plaintiff was not charged with being a racketeer or a Chicago gangster. The policy of the milk pool, of which he was president, and which he was said by defendant Beck to dominate, was compared not with the general activities of gangsters and racketeers, but with certain limited activities relative to the shipment of milk into the city of Chicago. It was not charged that the contract was ever more than proposed, or that means amounting to extortion were used to put it in force and effect. A jury could have concluded that this was simply a criticism in caustic and somewhat extravagant language of a proposed activity of the pool, adopted under the leadership of plaintiff and claimed to have a more damaging effect upon the farmer than activities of Chicago gangsters. The jury was entitled to conclude that no charge was made or intended that plaintiff personally would profit by the transaction. This conclusion was especially permissible, in view

of the fact that the payment clause was quoted, from which it appeared that the sums were to be paid to the negotiation or bargaining committee of the pool. It is quite clear that plaintiff was not charged with being a thief or murderer, or with any of the activities frequently associated with Chicago gangsters. The definition of "racketeer" and the activities of Chicago gangsters, with which comparison of the pool contract is made, are so limited as to at least permit a jury to find that a person of average intelligence would not understand that plaintiff was charged with the sinister activities popularly associated with such persons. We conclude that the broadcast did not so unambiguously charge plaintiff with the crime of extortion as to remove the issue from the jury.

The next question is whether the use of the words "racketeer" and "Chicago gangster," or either of them, in their commonly accepted meaning, and as therein applied to the plaintiff, naturally tended to bring plaintiff into shame, humiliation, or disgrace. In determining this question a portion of what has already been said is applicable. The jury was entitled to conclude that the broadcast would not be understood, (1) to charge plaintiff with being a racketeer or a Chicago gangster, or (2) with being guilty of such activities as are generally associated with persons so designated. This, of course, does not completely solve the question. In the law of, libel, as contrasted with that of slander or oral defamation, comments or epithets of an abusive character tending to bring the person at whom they are directed into contempt, hatred, or ridicule are defamatory *per se*. In *Robertson v. Edelstein, supra*, it is pointed out that in the case of oral statements mere abuse or vilification falling short of a charge of crime does not constitute slander in the absence of special damage. See also *Lansing v. Carpenter*, 9 Wis. *540; *Earley v. Winn*, 129 Wis. 291, 109 N. W. 633; *Vinson v. O'Malley*, 25 Ariz. 552, 220 Pac. 393, 37 A. L. R. 877. That the rule is different in actions for libel, see *Lukaszewicz v. Dziadulewicz*, 198 Wis. 605, 225 N. W. 172;

*Buckstaff v. Viall,* 84 Wis. 129, 54 N. W. 111; *Williams v. Hicks Printing Co., supra; Finnegan v. Eagle Printing Co.* 173 Wis. 5, 179 N. W. 788; *Walters v. Sentinel Co.* 168 Wis. 196, 169 N. W. 564; *Putnam v. Browne, supra.*

In *Putnam v. Browne, supra,* a comment likening the plaintiff's activities to those of Judas Iscariot was held to be defamatory in spite of the fact that it was a comment and not a statement of fact. In *Buckstaff v. Viall, supra,* the use of the word "Pecksniff" in referring to plaintiff was held libelous *per se.* On the other hand, in *Grell v. Hoard,* 206 Wis. 187, 239 N. W. 428, the likening of plaintiff's activities to those of a highwayman was held not to be defamatory as a matter of law, where from the context it appeared that defendant was criticising plaintiff's activities as superintendent of highways, and contending that the manner of constructing these highways was a menace to life and safety. Again, it is necessary to call attention to the fact that the question is not whether a jury could find the broadcast to have had a tendency to bring plaintiff into contempt, hatred, or ridicule, but whether the broadcast so unambiguously and clearly had these tendencies as to leave no issue for the jury. A careful consideration of the broadcast as a whole leads us to the conclusion that there was a question for the jury, and that minds might reasonably differ as to the tendencies of the article. The jury was asked merely whether the use of the terms "racketeer" and "Chicago gangster" in relation to plaintiff tended to bring plaintiff into shame, humiliation, or disgrace. In view of the fact that the first of these terms was used in a limited sense, and that the activities of the second, to which the pool activities were likened, were also very much limited; that there is no charge that plaintiff ever carried out or put into execution the contract to which the criticism was directed, and that there is at least ground for the interpretation that plaintiff was being criticized, not personally, but in his capacity as president of the pool, we think it was a jury question whether the terms would naturally tend

to bring plaintiff into shame, humiliation, or disgrace. Taking the broadcast as a whole, and in the light of the surrounding circumstances, the case is hardly comparable to the designation of plaintiff in the *Putnam Case* as Judas Iscariot, or that in the *Buckstaff Case* as "Pecksniff." The case seems to be more comparable to that of *Grell v. Hoard, supra,* where this court held on demurrer that the use of the word "highwayman" to designate plaintiff, and the comparison of the activities of a highwayman with those of the plaintiff, did not, under the circumstances, tend to bring plaintiff into disgrace or humiliation, or subject him to ridicule.

In view of these comments, it is unnecessary to consider plaintiff's contentions with respect to privilege and fair comment. There being a jury question as to the defamatory character of the broadcast, and the jury having found against plaintiff, these matters become immaterial.

Plaintiff assigns numerous errors in instructions and in the admission or rejection of evidence. Most of these are assigned without argument, and a detailed consideration of each would unduly extend this opinion without performing a corresponding service. It is enough to say that we have examined each carefully, and discover no prejudicial error.

The principal complaint is that the court should have limited the scope of the evidence offered by defendants. Speaking generally, this could not properly have been done, since the issues under the pleadings were extremely broad. We are satisfied that in the one or two individual instances where it might be contended that error was committed, no prejudice resulted. The jury assessed a very substantial sum in damages, which does not support the conclusion that they were unduly influenced by the scope or character of the testimony, and the prejudicial character of such errors as there might have been does not otherwise affirmatively appear.

*By the Court.*—Judgment affirmed.