598

STATE EX REL. HAMPEL, Appellant, vs. MITTEN, Sheriff, Respondent.

*January 12—May 17, 1938.*

*Gerald P. Hayes* of Milwaukee, for the appellant.

For the respondent there were briefs by *Rubin, Zabel & Ruppa,* attorneys, and *W. C. Zabel* of counsel, all of Milwaukee, and oral argument by *W. C. Zabel.*

A brief was also filed by the *Attorney General* and *Warren H. Resh,* assistant attorney general, as *amicus curiæ.*

The following opinion was filed March 15, 1938:

FAIRCHILD, J. It was the view of the trial court that the case was governed by *State ex rel. Pelishek v. Washburn,* 223 Wis. 595, 601, 270 N. W. 541; that in order to state a cause of action the complaint must show that the minds of the electors were so affected by the alleged false statements that the real will of the electors cannot be ascertained; that the election statistics affirmatively show that the will of the electors can be ascertained notwithstanding defendant's alleged violation; and that therefore the complaint states no cause of action. The trial court relied principally on sec. 5.01 (6), Stats., which provides:

"This title shall be construed so as to give effect to the will of the electors, if that can be ascertained from the proceed-

ings, notwithstanding informality or failure to comply with some of its provisions."

It was considered that the rule of the *Pelishek Case, supra,* was that a mere violation of a provision of the Corrupt Practices Act does not of itself result in deprivation of office; that the dominant purpose of the act is to protect the public and assure that the true choice of the voters is expressed; and that one indulging in a forbidden practice takes a chance of losing office if it should appear even doubtful whether the will of the electors has been expressed by the result; that where, however, the actual will of the electors can be ascertained, that will must prevail under sub. (6) of sec. 5.01, Stats. The court analyzed the election returns and concluded: (1) That plaintiff was one of eight candidates running on the Progressive ticket, all of whom were defeated by candidates running on the Democratic ticket; (2) that plaintiff received the third highest vote of the candidates of his party for various offices, and that defendant received the smallest number of votes of any candidate on his ticket; and (3) that in the Polish wards, where the circulation of the statements was most current, plaintiff had a relatively high vote compared to that in other wards or sections. The conclusion was that even if the statements were false and known by defendant to be so, they did not influence the electorate to the prejudice of plaintiff or prevent ascertainment of the will of the electorate.

As was pointed out in the *Pelishek Case,* ch. 12, Stats., constituting the Corrupt Practices Act, taken in connection with sec. 5.01 (6), Stats., offers substantial difficulties of construction. Literally construed, ch. 12 provides for a judgment of ouster in the case of any violation of the act, however technical or insubstantial (sec. 12.24). However, sec. 5.01 (6) requires the chapter to be so construed as to

give effect to the will of the electors if that can be ascertained from the proceedings, notwithstanding informality or failure to comply with some of its provisions. It was pointed out in the *Pelishek Case* that sec. 5.01 (6) was expressly made applicable to ch. 12, and that however difficult the task of the court, effect must be given to it, and it must be held to have some modifying effect upon the provisions of ch. 12. The difficulty is to ascertain its intended effect in relation to all of the numerous violations set forth in ch. 12, some serious and substantial, others relatively trivial. In the *Pelishek Case,* the alleged violation was of sec. 12.14 (2), which provides that every person who is a candidate for any municipal office, the income of which shall exceed $300, who in his own name or that of any other person owns any financial interest in any newspaper or periodical circulating in part or in whole in Wisconsin, shall, before any such newspaper shall print any matter (other than that provided in sub. (1) of the same section) which is intended or tends to influence directly or indirectly any voting or primary election, file in the office of the county clerk of the county in which he resides a verified declaration stating the newspaper or periodical in which he has any interest or control and the nature and extent of such interest and control. The complaint in the *Pelishek Case* alleged that defendant was the editor and publisher of a weekly newspaper published in Clintonville and having a wide circulation; that he had a large financial interest in the paper and was one of the three candidates for the office of mayor; that he failed to file the verified statement required by sec. 12.14; and that on three occasions he published statements and other matter in his newspaper which tended directly to influence citizens in voting for him and against other candidates for mayor. It was held that while sec. 12.24 (1), if literally applied,

would render an election void for any violation of the act, sec. 5.01 (6) must be considered to modify the literal calls of the statute. The court said:

"It is considered, therefore, that before a judgment of ouster can be entered under the provisions of sec. 12.24 (1), there must be a finding that the act of omission or commission complained of so affected or tended to affect the mind of the electors that the real will of the electors cannot be ascertained. If the actual will of the electors can be ascertained, then the provisions of subsection (6) become operative, and a judgment should not be entered which sets aside the will of the electors and defeats their choice for the office in question."

Applying these principles, this court held that the complaint was defective in not alleging facts tending to show that the electorate of the city of Clintonville was so affected by the failure to file the required declaration that its will could not be ascertained. It was said that since defendant was notoriously the editor and publisher of the paper, the filing of a statement of his financial interest in the paper would not, under the circumstances, have given to the electors any more notice of his relation to the paper than they already had, and that from the face of the complaint this court could ascertain that in spite of the violation the will of the electors could be ascertained.. The court added:

"The drastic character of the provisions contained in ch. 12, Stats., may be accounted for by the fact that the legislature had in mind that only substantial violations such as prevented the ascertainment of the will of the electors, meaning thereby the untrammeled will of the electors, should operate to vacate the office and so defeat the will of the electors as declared by the election."

While the excerpt from the *Pelishek* opinion first set forth is probably open to the construction put upon it by the trial court, the quotation just made furnishes the true key to

the rule of this case. From a careful study of the Corrupt Practices Act and of sec. 5.01 (6), Stats., in their relation to each other, it is our conclusion that the purpose of sec. 5.01 (6) was to require the court, in spite of the literal meaning of the Corrupt Practices Act, so to construe it as to deny ouster in all cases where the violations were either technical, insubstantial, or trivial, or where from the very nature of the violation the minds of the electors could neither have been corrupted nor misled, as where the violation consisted of a mere omission to perform some prescribed act which was ancillary or auxiliary to the main purpose of the law, but which, of itself, could have no tendency to influence or affect the minds of the electors. When in the *Pelishek Case* it was said that in order to support an ouster the violation must be so substantial as to prevent ascertainment of the will of the electors, it was intended to hold that a deliberate, wilful, intentional, and substantial violation of the act which upon its face has a natural tendency to influence voters makes it impossible to ascertain the true will of the electors and carries with it the penalty of ouster. In no other way can a sensible meaning be given to the act. A literal compliance with the act would result in defeating the will of the electors because of insubstantial oversights on the part of candidates, technical violations which could have had no effect upon the result of the election and which are sufficiently deterred by the prescribed penalties other than ouster. To hold, however, that in every case where definitely corrupt or vicious methods have been deliberately used a straw vote must be taken or an elaborate investigation made to find out precisely what effect these tactics had upon the outcome of the election would be to make the act impossible of execution and render it nugatory for all practical purposes. A construction that denies the remedy of ouster in cases of insubstantial or technical violations that

could not have affected the result, and at the same time enforces ouster in the case of deliberate and substantial violations, carries into effect the spirit and intent of the act without making it a trap for the innocent but unwary candidate. This seems to have been the basis upon which other corrupt-practice statutes have been deliberately drafted. For example, the English act, 58 & 59 Victoria, provides that the elections shall not be void where the offenses are of a "trivial, unimportant, and limited character." The Minnesota act is in virtually the same form as the English act, and that of Massachusetts provides that inadvertent, accidental conduct and miscalculations and "trivial, unimportant, or immaterial" variations from the terms of the Corrupt Practices Act do not void an election. While we would prefer that ch. 12 be made more explicit on this point, we adopt the only construction that can reasonably result from the impact of sec. 5.01 (6) upon the corrupt-practices chapter. In this connection we think that some notice should be given to an intimation in the brief on behalf of plaintiff that *State ex rel. La Follette v. Kohler,* 200 Wis. 518, 552, 554, 228 N. W. 895, appears to declare a rule even more strict than that here adopted. The court there said:

"There would seem to be little doubt that the clear legislative purpose was to declare that a violation of the act by a candidate should render his election void. It is difficult to read anything else out of it. . . .

"What the statute in effect does is to create a conclusive presumption that a violation of the statute chargeable to the person receiving the highest number of votes renders his election void because the result was achieved by practices declared by the statute to be corrupt and illegal."

While these passages, considered out of their context, would appear to disregard the effect of sec. 5.01 (6), Stats., and to be inconsistent with the *Pelishek Case* and with what we have heretofore said, an examination of the opinion will disclose that the statements were not addressed to the prob-

lem here involved, nor was this question there raised or considered.

Reference has been made to the difficulty of construing ch. 12, Stats., in the light of sec. 5.01 (6). Beyond stating the general principles by which this court will be guided in the process of construction, little more that is helpful can be added. The application of these principles to particular violations will have to be considered as the cases arise, unless in the meantime the act is clarified by legislative amendment.

In this case the violation charged is of sec. 12.17, Stats., which reads as follows:

*"False statements affecting candidates.* No person, firm, or corporation shall knowingly make or publish, or cause to be made or published, any false statement in relation to any candidate, which statement is intended or tends to affect any voting at any primary."

Under this section the person making the statements referred to must have known them to be false.

Nothing is more important in a democracy than the accurate recording of the untrammeled will of the electorate. Gravest danger to the state is present where this will does not find proper expression due to the fact that electors are corrupted or are misled. It may also be undesirable that the electorate be subject to appeals to emotions, prejudices, or bias, but it is very difficult to legislate against such appeals without infringing upon freedom of speech and discussion. It is, however, possible and feasible to require of candidates that statements of fact known to be false and so substantially bearing upon the fitness of other candidates as to have a tendency to influence votes shall not be made the basis of appeals for votes. A section designed to accomplish this end cannot be accorded other than an important and substantial place in a chapter dealing with corrupt practices, and its deliberate violation cannot be other than a substantial and important transgression, except in instances where the

subject matter of the statement is trivial or inconsequential, in which cases it doubtless would not tend to influence voters. The tendency of such false statements to affect the result of an election where they have a substantial bearing upon the fitness of candidates is obvious upon its face. The actual effect of such statements is incalculable, rendering it impossible to ascertain the will of the electors under sec. 5.01 (6), Stats.

We, therefore, conclude that in a proceeding under the Corrupt Practices Act an allegation of a violation of sec. 12.17, Stats., which consists of an attack upon the moral character of a candidate for sheriff need not be accompanied by any allegation as to the actual effect of the violation upon the fortunes of the candidates involved in the election.

The next question is whether the complaint sufficiently alleges a violation of sec. 12.17, Stats. It is contended by defendant that there is no specific application to plaintiff of the words "love pirate and demoralizer of families." We think the complaint sufficiently alleges that these references were to plaintiff. Considered as a whole, the address leaves little doubt in this respect, and the complaint does not need a liberal construction to avoid defendant's objection. Whatever difficulties there are come from an entirely different source. This is not a complaint in libel or slander, but a proceeding to enforce penalties under a special statute directed against corrupt practices in elections for a violation of that portion of the statute which prohibits any person from knowingly making false statements concerning a candidate. Although it was not necessary to the decision of the case, this court in *Putnam v. Browne,* 162 Wis. 524, 155 N. W. 910, strongly intimated that sec. 12.17 prohibited false and libelous *statements of fact* concerning candidates. This would make the scope of the prohibition narrower than the field of libel, in that it would exclude from the operation

of the prohibition mere comments of an abusive and vituperative character, the effect of which was to bring a candidate into contempt, hatred, or ridicule, but which did not constitute statements of fact. In the *Putnam Case,* for example, a likening of the plaintiff to Judas Iscariot in a newspaper article was held not to be a statement of fact but a comment or criticism. It was nevertheless held to be libelous *per se* as having a tendency to bring plaintiff into public contempt, hatred, and ridicule. Had the action been for slander such a comment would not be defamatory *per se.* As to the distinction in this respect between libel and slander, see *Singler v. Journal Co.* 218 Wis. 263, 260 N. W. 431, and cases there cited.

It is our conclusion that sec. 12.17, Stats., was intended to be limited to statements of fact. It is of no moment under the section whether the statements are oral or written, and under these circumstances it would be difficult to suppose that the section meant to prohibit written comments of a vituperative character and to permit oral comment of similar character in accordance with the well-understood distinction between libel and slander. Further than this, it may well have been the legislative purpose not to interfere with complete freedom of political discussion beyond requiring that statements of fact concerning candidates should not be knowingly false. It may well have been supposed that the integrity of elections would be sufficiently protected by a statute of such limited scope, leaving to the injured party redress under the law of defamation. There is another reason why this construction appears to be sound. Although the decision in the *Putnam Case, supra,* refers to the section as prohibitive of libelous statements of fact, it is plainly broader in some respects than the law of defamation, and statements of fact concerning a candidate, false and known to be such, may constitute a violation even though not

defamatory provided they are intended to or tend to affect votes, and may be the basis for ouster unless they are demonstrably of a trivial and inconsequential character. For example, should the voting record or affiliations of a candidate or his utterances with respect to matters having relevancy to the issues be knowingly misrepresented, both the letter and spirit. of the statute would be violated, even though the statements might not qualify as libel or slander. Thus, we conclude that the section is in some respects narrower and in others broader than the law of defamation, and that the latter, while it may furnish analogies useful in applying the statute, cannot be imported bodily into ouster proceedings under the statute.

The application of the foregoing principles requires the conclusion that as the complaint is drawn the reference to plaintiff as a love pirate and demoralizer of homes, and the comparison of him to a thief, fall within the field of comment, as did the likening of plaintiff to Judas Iscariot in the *Putnam Case.* As such they are not actionable under sec. 12.17, Stats.

Whether such comment might have standing as an assertion of fact if unaccompanied by any statement of fact as a professed basis for it there is no occasion to determine. The question is whether, aside from that portion of the address which we have denominated comment, the complaint charges a false statement of fact by defendant of and concerning plaintiff reflecting substantially upon plaintiff's moral fitness for the office of sheriff. The nearest approach to an express statement of fact attributed to defendant is that plaintiff wrote to a married woman a letter the contents of which are undisclosed by the pleadings. The failure to plead the contents of the letter raises a question whether the complaint sufficiently alleges by inference that the undisclosed contents of the letter were of such a character that it could not properly be sent to a married woman by plaintiff,

and that its sending would be evidence of bad moral character. This leaves the sole respect in which the statement was charged to be false the existence of the marital status of the woman. Falsity in this respect could be material only if the status had some bearing or materiality.

Freedom of speech means more than a right to speak. With speaking effectively must go the right to use words in an accepted sense. If a complete statement squares with the truth, the speaker cannot be said to have transgressed the statutes merely because a word or phrase, taken from the context, might have a technical or particular meaning differing from the meaning plainly conveyed when the whole statement is fairly considered. We are not now concerned with the niceties involved in the conduct of a political campaign. Undoubtedly men encountering opposition expressed on the stump, in newspaper, and pamphlet from Washington's time to the present have had occasion to, feel grieved over treatment accorded them.

In this case the defendant read a letter and said, "I have photostatic copies of this letter written to a married woman." The letter was necessarily and essentially a part of the statement, but it is left out of the complaint. We do not know the contents of the letter, but whether innocent or otherwise, on it the statement or comment complained of rested. It was the all-in-all of the statement. Granting that the reference to "a married woman" was a misstatement of fact because the woman referred to had been divorced, the question of its materiality arises, and this can be determined only from the letter. Was the letter such that the sending of it to "a married woman" indicated a blacker character than sending it to "a woman," "a single woman," or "a divorced woman?"

Ouster from office, under this law, is too severe a penalty to be used as a threat. Both the individual involved and the public service are necessarily affected. The proceeding

should not be begun unless there is cause for a reasonable belief that the successful candidate has used unlawful methods in securing his election. Where in a speech he has given his facts on which he bases his comment, the substance at least, if not the statement *in haec verba,* must be set out before a complaint requiring the candidate to defend is sufficient as a pleading.

Plaintiff alleged:

"on information and belief, that the defendant, upon reading the said letter hereinbefore referred to concluded his statements about the relator as follows:

" 'Such is the type of man he is, asking you to vest him with the safety of Milwaukee county, can he, in view of these facts, demand of fathers and mothers living in this county, that they elect him the chief law enforcement officer?' "

With this pleading before the court, a situation is presented where the charge is not stated because there has been left out by the plaintiff the very thing on which his case must stand or fall. The letter has become a formal fact, the omission of which, in substance or in full, is fatal to the cause of action.

*By the Court.*—Order affirmed.

FRITZ, J., took no part.

A motion for a rehearing was denied, with $25 costs, on May 17, 1938.